16-2211, -2268

IN THE

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT

WCM INDUSTRIES, INC.,

*Plaintiff-Cross-Appellant*,

v.

IPS CORPORATION,

*Defendant-Appellant*,

and

AMERICAN BRASS & ALUMINUM FOUNDRY COMPANY,
and JOHN DOE,

*Defendants.*

**Appeals from the United States District Court for the
Western District of Tennessee in Case No. 2:13-cv-02019,
Judge Jon P. McCalla**

**CORRECTED NON-CONFIDENTIAL PRINCIPAL AND RESPONSE
BRIEF OF PLAINTIFF-CROSS-APPELLANT WCM INDUSTRIES, INC.**

TODD P. BLAKELY
IAN R. WALSWORTH
KENDRIA E. PEARSON
JOHN C. HEUTON
SHERIDAN ROSS, P.C.
1560 Broadway, Suite 1200
Denver, Colorado 80202
(303) 863-9700

J. MICHAEL JAKES
KATHLEEN A. DALEY
JASON L. ROMRELL
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

*Attorneys for Plaintiff-Cross-Appellant*

November 29, 2016

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross-Appellant WCM Industries, Inc., certifies the following:

1.  The full name of every party represented by me is:

    WCM Industries, Inc.

2.  The name of the real party in interest represented by me is:

    WCM Industries, Inc.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

    None

4.  The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this Court) are:

    David B. Kellis, Hiwot Molla Covell
    SHERIDAN ROSS P.C.

    Stanley M. Gibson
    JEFFER MANGELLS BUTLER & MARMARO LLP

    Glen G. Reid, Jr.
    WYATT TARRANT & COMBS, LLP

    Matthew F. Jones
    MATTHEW F. JONES, ATTORNEY AT LAW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................vi

STATEMENT OF RELATED CASES ...................................................xi

STATEMENT OF JURISDICTION...........................................................1

I.    STATEMENT OF THE ISSUES ....................................................2

II.   PRELIMINARY STATEMENT .....................................................3

III.  STATEMENT OF THE CASE .......................................................6

    A.   WCM's Innovator Products Eliminated Problems Plaguing
        Bathtub Overflows for Decades ...........................................6

        1.   Traditional Overflows Were Difficult to Install and
            Prone to Leaks.............................................................6

        2.   WCM's Patented Innovator Technology Is Easier to
            Install, Easier to Test, and Eliminates Leaks ..............8

    B.   WCM Sued IPS and Proved Willful Infringement ............13

        1.   AB&A—Now IPS—Copied WCM's Innovator
            Product .......................................................................13

        2.   This Litigation Began in Tennessee...........................17

        3.   The District Court's Pretrial Rulings and IPS's
            Revised Classic Product Line ....................................17

        4.   The Jury Found WCM's Patents Are Valid and IPS
            Willfully Infringed ....................................................20

        5.   After Trial, the District Court Upheld IPS's
            Willfulness, Literal Infringement, and Indirect
            Infringement, but Set Aside the Jury's Verdict of
            Infringement Under the Doctrine of Equivalents ....................23

        6.   The District Court Found Clear and Convincing
            Evidence of Objective Willfulness and Enhanced
            Damages......................................................................25

IV.   SUMMARY OF ARGUMENT .................................................. 27

V.   STANDARD OF REVIEW .................................................. 29

VI.   ARGUMENT ON WCM'S CROSS-APPEAL ............................ 31

   A.   IPS Led the District Court to Erroneously Create a Per Se
      Rule That the Doctrine of Equivalents Always Requires
      Expert Testimony ................................................................ 31

   B.   Substantial Evidence Supports the Jury's Finding That IPS
      Directly Infringed WCM's Patents Under the Doctrine of
      Equivalents by Making and Selling the Revised Classic
      Product Line ...................................................................... 34

      1.   WCM Needs Only to Show Sufficient Evidence of
         Equivalents and Linking Testimony for a Single
         Claim Element to Sustain the Jury's Verdict ........................... 34

      2.   Substantial Evidence—Including Particularized
         Testimony from Several Persons of Ordinary Skill in
         the Art—Support the Jury's Conclusion That the
         Differences Between IPS's Modified Locknut and the
         Claimed Locknut Are Insubstantial ........................................ 36

VII.   ARGUMENT ON IPS'S APPEAL ............................................. 44

   A.   Irrespective of Whether IPS Directly Infringed, Substantial
      Evidence Supports the Jury's Verdict of Indirect
      Infringement ...................................................................... 44

      1.   IPS Conflates Its Direct Infringement with Direct
         Infringement by "Others" ....................................................... 46

      2.   IPS Has Waived Any Argument That the Jury's
         Verdicts Are Inconsistent ...................................................... 49

      3.   Under the Correct Law for Indirect Infringement,
         Substantial Evidence Supports the Jury's
         Determination That Others Directly Infringed by
         Using the Revised Classic Product Line, Even If IPS
         Itself Did Not Directly Infringe When It Made and
         Sold the Revised Classic Product Line ..................................... 51

B.      Substantial Evidence Supports the Willfulness Verdict,
        Which the Jury Reached Even Applying the More Exacting
        "Clear and Convincing" Standard ......................................................56

C.      The District Court Did Not Abuse Its Discretion in Trebling
        Damages Given the Particular Circumstances of This Case
        and IPS's Egregious Conduct.............................................................65

D.      The District Court Did Not Abuse Its Discretion in
        Awarding Enhanced Damages as to the Revised Classic
        Product Line .......................................................................................67

VIII.  CONCLUSION..............................................................................................69

## CONFIDENTIAL MATERIAL

The highlighted text in this brief refers to material that IPS Corp. has designated as confidential under the protective order in this case in accordance with Fed. R. Civ. P. 26(c) (Appx303-320) and that WCM Industries, Inc., has omitted from the non-confidential version of this brief under Fed. Cir. R. 28(d)(1)(A). Text highlighted on pages 3, 16, 60, and 62 relates to an IPS Corp. agreement. Text highlighted on pages 3, 16, 21, 26, 29, 60, and 62 relates to IPS Corp.'s internal employee practices and correspondences.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)............................................................................5

*Apple Inc. v. Samsung Electronics Co.*,
839 F.3d 1034 (Fed. Cir. 2016) (en banc) ........................................55

*AquaTex Industries, Inc. v. Techniche Solutions*,
479 F.3d 1320 (Fed. Cir. 2007) ...............................................6, 32, 33

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*,
369 U.S. 355 (1962)..........................................................................50

*Barnes v. City of Cincinnati*,
401 F.3d 729 (6th Cir. 2005) ............................................................29

*Braun Inc. v. Dynamics Corp. of America*,
975 F.2d 815 (Fed. Cir. 1992) ..........................................................30

*Callaway Golf Co. v. Acushnet Co.*,
576 F.3d 1331 (Fed. Cir. 2009) ........................................................51

*Centricut, LLC v. Esab Group, Inc.*,
390 F.3d 1361 (Fed. Cir. 2004) ........................................................33

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
668 F.3d 1340 (Fed. Cir. 2012) ........................................................29

*Comark Communications, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ............................................35, 36, 44

*Conoco, Inc. v. Energy & Environmental International, L.C.*,
460 F.3d 1349 (Fed. Cir. 2006) ........................................................68

*Convolve, Inc. v. Compaq Computer Corp.*,
527 F. App'x 910 (Fed. Cir. 2013) ...................................................52

*DSU Medical Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) ........................................................46

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004) ........................................................................49

*Fromson v. Citiplate, Inc.*,
  886 F.2d 1300 (Fed. Cir. 1989) ........................................................................59

*Gemalto S.A. v. HTC Corp.*,
  754 F.3d 1364 (Fed. Cir. 2014) ........................................................................33

*Genentech, Inc. v. Wellcome Foundation Ltd.*,
  29 F.3d 1555 (Fed. Cir. 1994) ........................................................................30

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011).................................................................................46, 57

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*,
  339 U.S. 605 (1950).......................................................................6, 27, 32, 33

*Gustafson, Inc. v. Intersystem Industrial Products, Inc.*,
  897 F.2d 508 (Fed. Cir. 1990) ....................................................................58, 59

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
  136 S. Ct. 1923 (2016)...........................................................................*passim*

*Hilton Davis Chemical Co. v. Warner-Jenkinson Co.*,
  62 F.3d 1512 (Fed. Cir. 1995), *rev'd on other grounds*,
  50 U.S. 17 (1997)..........................................................................................34

*In re Bill of Lading Transmission & Processing Systems Patent
  Litigation*,
  681 F.3d 1323 (Fed. Cir. 2012) ................................................................. 51-52

*In re Seagate Technology, LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) (en banc) ...................................................26, 63

*Jewell v. Holzer Hospital Foundation, Inc.*,
  899 F.2d 1507 (6th Cir. 1990) .........................................................................50

*Kaufman Co. v. Lantech, Inc.*,
  807 F.2d 970 (Fed. Cir. 1986) .........................................................................61

*Limelight Networks, Inc. v. Akamai Technologies, Inc.*,
  134 S. Ct. 2111 (2014)..............................................................................25, 46

*Logan v. Dayton Hudson Corp.*,
   865 F.2d 789 (6th Cir. 1989) ............................................................................65

*Lucent Technologies, Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ......................................................................52

*Malibu Boats, LLC v. MasterCraft Boat Co.*,
   No. 3:16-CV-82-TAV-HBG (E.D. Tenn. Oct. 28, 2016),
   ECF No. 43 ......................................................................................................61

*Minnesota Mining & Manufacturing Co. v. Johnson & Johnson
   Orthopedics, Inc.*,
   976 F.2d 1559 (Fed. Cir. 1992) .................................................................29, 61

*Minnesota Mining & Manufacturing Co. v. Chemque, Inc.*,
   303 F.3d 1294 (Fed. Cir. 2002) ......................................................................51

*Mycogen Plant Science, Inc. v. Monsanto Co.*,
   243 F.3d 1316 (Fed. Cir. 2001) .................................................................49, 51

*National Presto Industries, Inc. v. West Bend Co.*,
   76 F.3d 1185 (Fed. Cir. 1996) ........................................................................62

*Nolfi v. Ohio Kentucky Oil Corp.*,
   675 F.3d 538 (6th Cir. 2012) .....................................................................30, 49

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014) ..............................................................................56, 65

*Ralston Purina Co. v. Far-Mar-Co, Inc.*,
   772 F.2d 1570 (Fed. Cir. 1985) ......................................................................58

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) ...................................................................26, 65

*Ring & Pinion Service Inc. v. ARB Corp.*,
   743 F.3d 831 (Fed. Cir. 2014) ...................................................................34, 40

*Rolls–Royce Ltd. v. GTE Valeron Corp.*,
   800 F.2d 1101 (Fed. Cir. 1986) ......................................................................59

*Safeco Insurance Co. of America v. Burr*,
   551 U.S. 47 (2007)...........................................................................................56

*State Industries, Inc. v. A.O. Smith Corp.*,
  751 F.2d 1226 (Fed. Cir. 1985) ........................................................58

*Stryker Corp. v. Zimmer, Inc.*,
  837 F.3d 1268 (Fed. Cir. 2016) ....................................................5, 64

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) .......................................33, 34, 37, 44

*Toshiba Corp. v. Imation Corp.*,
  681 F.3d 1358 (Fed. Cir. 2012) ........................................................52

*WBIP, LLC v. Kohler Co.*,
  829 F.3d 1317 (Fed. Cir. 2016) ........................................................56

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
  837 F.3d 1358 (Fed. Cir. 2016) ......................................30, 56, 59, 66

*Williams v. Nashville Network*,
  132 F.3d 1123 (6th Cir. 1997) ..........................................................30

## Statutes

28 U.S.C. § 1292(c)(2) ........................................................................1

28 U.S.C. § 1338(a) .............................................................................1

28 U.S.C. § 2107 .................................................................................1

35 U.S.C. § 271(a) ............................................................................46

35 U.S.C. § 271(b) ............................................................................46

35 U.S.C. § 271(c) ............................................................................46

35 U.S.C. § 284 .....................................................................65, 67, 68

**Rules**

Fed. R. App. P. 4(a) ...................................................................................1

Fed. R. Civ. P. 49(b) .........................................................4, 28, 49, 50, 51

Fed. R. Civ. P. 50(a)................................................................1, 23, 24, 50

Fed. R. Civ. P. 50(b) ...............................................................................1, 25

Fed. R. Civ. P. 59(e).........................................................24, 30, 45, 50

## STATEMENT OF RELATED CASES

There have been no other appeals from the present civil action in this or any other appellate court.

Counsel for Plaintiff-Cross-Appellant WCM Industries, Inc., is not aware of any other cases that will directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

(a) The statutory basis for jurisdiction of the trial court was 28 U.S.C. § 1338(a).

(b) The statutory basis for jurisdiction of this Court to hear this appeal is 28 U.S.C. § 1292(c)(2), the district court having granted in part IPS's motion for judgment as a matter of law under Fed. R. Civ. P. 50(a) and issued a final judgment on December 4, 2015, Appx1, which became appealable on May 12, 2016, when the district court denied IPS's renewed motion for judgment as a matter of law under Fed. R. Civ. P. 50(b).

(c) WCM's cross-appeal was timely filed on June 10, 2016, in accordance with 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a).

## I.    STATEMENT OF THE ISSUES

1.    Whether the district court, in setting aside the jury's verdict that IPS directly infringed WCM's patents under the doctrine of equivalents, erroneously created a new per se rule requiring expert testimony, even where other witnesses of ordinary skill in the art provided particularized testimony and linking argument of equivalency.

2.    Whether the jury's verdict that IPS is liable for induced and contributory infringement with respect to its Revised Classic product line is supported by substantial evidence, where indirect infringement requires only that *someone* directly infringes, irrespective of whether the inducer or contributor directly infringes.

3.    Whether the district court abused its discretion under *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016), in awarding treble damages, where the jury found WCM proved by clear and convincing evidence that IPS's infringement was subjectively willful and the district court determined that IPS's infringement was objectively willful.

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO
PROTECTIVE ORDER**

## II.    PRELIMINARY STATEMENT

If the overflow in your bathtub was installed in the last ten years or so, it is highly likely that one of WCM Industries, Inc.'s inventions at issue in this case is in your bathtub right now. In the 1990s, traditional bathtub overflows were difficult to install. Tightening screws during installation often left sharp burrs that could cut through skin. Traditional overflows were prone to leaks too, which could result in significant yet hidden damage to both property and health (i.e., exposure to mold and mildew).

Recognizing these problems, WCM developed a novel solution—the Innovator product. WCM's new technology did not require screws, was much easier to install, and eliminated leaks. Given all of these advantages, the Innovator has been a phenomenal success in the marketplace.

Recognizing these advantages yet unwilling to develop its own solution, American Brass & Aluminum Foundry Co. ("AB&A") copied WCM's Innovator product. And when IPS Corp. acquired AB&A in 2010, it continued selling the same products, even while knowing that AB&A did not come up with its own products and had a history of copying WCM. IPS fully recognized these risks, continued to ███████████████, and even obtained ██████████ from AB&A for any ██████████ of ██████████ as part of its acquisition of AB&A.

WCM's patents covering the Innovator technology issued, and eventually, WCM sued IPS for infringement. The jury found all of WCM's patents valid and infringed. The jury further found that WCM had proved *by clear and convincing evidence* that IPS's infringement was willful.

As the district court found, this case was "not a 'close call.'" Appx39-40 (citation omitted). IPS's appeal raises some of the same arguments that the court found to be "not objectively reasonable." Appx32. In particular, IPS continues to misunderstand the basic elements of indirect infringement, insisting that it cannot be liable for indirect infringement if it did not directly infringe too. But indirect infringement requires only that *someone* directly infringe. And that "someone" can be a customer or purchaser. At its core, IPS's challenge to indirect infringement is an argument that the jury's verdicts were somehow inconsistent. Yet IPS never raised that issue as a Fed. R. Civ. P. 49(b) motion in the district court, and thus cannot raise it now.

IPS's challenge to the jury's willfulness verdict and the district court's award of enhanced damages fares no better. According to IPS, an infringer must be allowed a certain amount of time after a patent issues to "develop" willfulness. IPS Br. 36. That has never been the law. Moreover, IPS's per se rule runs against the Supreme Court's flexible framework in *Halo* for determining willfulness. IPS further invites this Court to reweigh the totality of the circumstances underlying

the jury's subjective-willfulness finding and the district court's enhanced-damages award, hoping this time to get a different result. But a trial is the "main event" in litigation, not simply a "tryout on the road" to appellate review. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citation omitted). The jury found WCM proved by clear and convincing evidence that IPS's infringement was subjectively willful when all that is now required is a preponderance of the evidence. *See Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016) ("The jury made its determination under the clear and convincing evidence standard, which is a higher standard than is now necessary. We therefore affirm the jury's finding of willful infringement."). And the district court, having lived with this case for over three years, was thorough in its decision to award enhanced damages, finding WCM also proved IPS's objective willfulness by clear and convincing evidence. "[B]ased on the egregious nature of IPS's conduct," the district court concluded "that treble damages are appropriate." Appx41. IPS does not even mention the abuse-of-discretion standard of review it faces in trying to undo the enhanced-damages award.

WCM's cross-appeal focuses on a single error—the district court's decision to set aside the jury's verdict that IPS directly infringes under the doctrine of equivalents. The source of the court's error was IPS's repeated arguments that opinion testimony—and specifically expert testimony—is required in all

circumstances to establish infringement under the doctrine of equivalents. Not so. In fact, this Court and the Supreme Court "have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, for example 'through testimony of experts *or others versed in the technology*; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.'" *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (emphasis added) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)). Under the correct standard, substantial evidence supports the jury's verdict that IPS infringes under the doctrine of equivalents.

## III.   STATEMENT OF THE CASE

### A.   WCM's Innovator Products Eliminated Problems Plaguing Bathtub Overflows for Decades

#### 1.   Traditional Overflows Were Difficult to Install and Prone to Leaks

Overflows are critical to the proper function and installation of a bathtub. Appx223 at 1:18-50. Not only are they used to test for leaks in the plumbing assembly and to clean out the plumbing line, *id.*, but they also prevent health risks and property damage caused by accidental overflow of water from the bathtub, Appx1609 at 477:4-23.

In the 1990s, the traditional method of installing an overflow was considered a cumbersome and difficult job requiring at least two people. Appx223 at 1:18-28; Appx1348-1353 at 252:8-257:10. Often in very cramped quarters, one person

6

would stand behind a wall abutting the bathtub and hold a sealing washer securely in place while a second person installed one or more screws into a plate to cover the overflow. Appx1348-1353 at 252:8-257:10. Parts would often break and crack during installation. Appx1353 at 257:11-21. Moreover, contractors would often use power tools to tighten the screws, resulting in the compression being either too loose or too tight. Appx1353-1354 at 257:22-258:17. Too tight, and the plate would crack, Appx1354 at 258:4-5; too loose, and the resulting gap might result in water leaking down the back of the wall, Appx1354 at 258:5-17. Even if the overflow appeared to be properly installed without any obvious gaps, later adjustments could move the plumbing just enough to create a gap in the seal, resulting in hidden water leakage and damage. Appx1354-1355 at 258:21-259:19; Appx1414-1416 at 282:12-284:3.

Disassembling traditional overflows for testing was a problem too. A builder would conduct a comprehensive test of the entire drainage system for leaks before the construction inspection is complete. Appx223 at 1:35-50; Appx1356-1360 at 260:22-264:1. The testing required removing the overflow plate—including the one or two screws holding the assembly together—and installing a test plug. Appx1356-1358 at 260:22-262:8. During the disassembly, important components, such as the seal, could be accidently dislodged and lost behind the wall without the installer even realizing. *Id.* After the testing was complete, the overflow plate had

to be installed again, and the cumbersome process was repeated, this time by someone who may or may not have been involved in the original installation and may not realize that a sealing washer is needed. *Id.* And without a properly installed seal, the resulting leaks damaged property and exposed occupants to mold and mildew. Appx1609 at 477:4-23.

Installing a final decorative cover plate or cap further complicated the process. After the initial installation, plumbers typically preferred to delay installing the final decorative cover plate until the end because they are vulnerable to damage during construction or remodeling. Appx223 at 1:29-34; Appx1478-1479 at 346:18-347:14. Thus, the installation process was repeated yet again.

Not only were traditional overflows difficult to install and uninstall, but they could also be dangerous, especially to small children. The installation screws were often made of zinc or brass, and were thus prone to corrosion and notching. Appx1355-1356 at 259:20-260:21. Dangerous burrs could form while tightening or removing screws, sharp enough to cut through skin. Appx1356 at 260:5-11.

### 2. WCM's Patented Innovator Technology Is Easier to Install, Easier to Test, and Eliminates Leaks

WCM's Watco division is an industry leader in plumbing and bathtub products. Recognizing many problems with the overflows of the 1990s, one of WCM's employees, William Ball, developed a solution: the Innovator overflow. Appx1419 at 287:9-15. Mr. Ball filed his original patent application on June 13,

2000,[1] which later resulted in the three patents at issue in this case: U.S. Patent Nos. 8,302,220 ("the '220 patent") (Appx214-226); 8,321,970 ("the '970 patent") (Appx227-257); and 8,584,272 ("the '272 patent") (Appx258-292). After months of attention to engineering and manufacturing refinements, WCM began selling its Innovator product in August 2001. Appx1197 at 101:10-17.

Figures 1 and 4 of the '220 patent show an example of Mr. Ball's invention, which was a "paradigm shift" in the industry. Appx1421-1423 at 289:24-291:3.



Appx218 (coloring supplied).

---

[1] The jury found that Mr. Ball first reduced his original overflow invention to practice on December 7, 1999. Appx205-207.

The overflow fitting 60 has an overflow pipe 62 and an elbow portion 65. Appx224 at 3:32-37. The overflow fitting 60 also has a lip 74 extending radially outward from an outer surface of the overflow pipe 62 that engages an outer surface 25 of the bathtub end wall 24 (as shown below in Figure 1). *Id.* at 3:42-48. Threaded upper end portion 66 extends through a port 30 into the tub. Instead of screws, Mr. Ball's invention uses a nut element 90 (green) that has threads compatible with the threads 68 on the upper end portion 66 of the overflow pipe 62. *Id.* at 3:59-4:10. When tightened on those threads, the nut element 90 presses the washer 94 into the tub wall, creating an effective seal. *Id.* And instead of using screws to attach cap 96, nut element 90 has a plurality of lugs 92 along the outer periphery that detachably engage the inner surface of cap 96. *Id.* at 3:66-4:6. Further, overflow fitting 60 can include a diaphragm 80, which seals the overflow when testing for leaks yet can be easily removed or punctured. *Id.* at 3:49-58. A test cap can also be used instead of a diaphragm. Appx1503-1505 at 371:25-373:9.



*Fig.1*

Appx216 (coloring supplied).

Mr. Ball's invention solved the problems associated with traditional bathtub overflows. Appx1820-1822 at 566:7-568:16. The Innovator is simple to install and allows for painless leak testing. Appx223 at 2:8-21; Appx1420-1423 at 288:25-291:20; Appx6673-6676. It is self-centering and easy to compress—the plumber can feel whether the fit is snug simply by rotating the nut element (also referred to as a "locknut" or "lock nut"). Appx1421 at 289:10-23. Mr. Ball painstakingly dialed-in the dimensions and threading of the Innovator components to create an

11

optimal fit and seal since there was no building code requiring a specific diameter or thread count. Appx1444 at 312:6-15; *see also* Appx1423-1430 at 291:24-298:17; Appx1434-1450 at 302:20-318:2. No tools are required, and a single person can install the Innovator without assistance. Appx1423 at 291:4-12; Appx1426-1427 at 294:11-295:18. Removing the screws not only makes the product safer for consumers, it is easier to install and uninstall. The cap is no longer required to hold the overflow assembly together and simply goes over and snaps onto the locknut at the end of construction, thereby avoiding damage. Appx223 at 2:11-13; Appx1423 at 291:13-20.

Claims 12 and 13 of the '220 patent (Appx226), claim 1 of the '970 patent (Appx257), and claims 11-13 of the '272 patent (Appx289-290) are at issue in this case. Claim 12 of the '220 patent is representative and recites "a nut element" (also referred to as a "nut body" in other claims and a "locknut" by the parties) with "radially extending lugs" (also referred to as "radially extending cap retention elements" in other claims).

> 12. An overflow assembly adapted for interconnection to a bathtub, which has a bottom, side walls, end walls, and an overflow port in one end wall, comprising:
>
> an overflow pipe with an elbow portion defining an upper end portion and a lower end portion, said upper end portion having an outer end defining an inlet, said upper end having threads on an outer surface thereof;

a lip extending radially outwardly from said outer surface of the overflow pipe between said elbow portion and said upper end portion and being spaced from said inlet;

*a nut element* with a threaded portion that is compatible with said threads of said overflow pipe, said nut element having an outer periphery with *a series of radially extending lugs that detachably engage an inner surface of a cap* that fits over said nut.

Appx226 (emphases added).

## B.    WCM Sued IPS and Proved Willful Infringement

### 1.    AB&A—Now    IPS—Copied    WCM's    Innovator Product

AB&A sold plumbing products too. But unlike WCM, AB&A did not design its own products. In fact, according to AB&A's president, Anthony Oropallo, AB&A *never* employed a single engineer, draftsmen, or full-time product developer. Appx1793 at 539:17-23; *see also* Appx1870-1871 at 616:25-617:12 (Michael Jaffa, an independent representative for AB&A and IPS, testifying that AB&A had neither engineers nor research and development). Instead of innovating, AB&A had a long history of copying WCM's products, Appx1265-1266 at 169:9-170:9; Appx1266-1267 at 170:13-171:15, including the Innovator.

Sometime between 2002 and 2003 (after WCM's Innovator had been on the market for months), AB&A began selling a bathtub waste and overflow product called the "Classic" product line. Appx1248 at 152:2-7. The Classic product line

included the Classic full kit,[2] the Classic half-kit,[3] and the Classic rough-in kit.[4]

Like WCM's Innovator, AB&A's Classic product line replaced screws with a locknut and further included an elbow having a threaded upper end portion for placing through the overflow port, a decorative cap (i.e., overflow plate), an elbow, and a washer.



Appx6800; *see also* Appx6686-6687; Appx6694.

---

[2] In addition to a complete drain assembly, a Classic full kit comes with a complete overflow assembly, including a locknut, a decorative cap, an elbow, a strainer body, a washer, a test cap, a stopper mechanism, a tee connector, and two drain pipes. Appx1913-1914 at 659:16-660:24.

[3] The Classic half-kit has the same overflow assembly parts as the Classic full kit, except it does not include the tee connector and the two drain pipes. Appx1910-1911 at 656:16-657:25; Appx1913-1914 at 659:16-660:11.

[4] The Classic rough-in kit is used during the early stages of plumbing and is the same as the Classic half-kit, except it does not include a decorative cap or a stopper mechanism. Appx1938-1940 at 684:15-686:12. While the Classic rough-in kit does not include a decorative cap, customers purchase a finish kit or trim kit that does have a decorative cap. *Id.*; Appx2004 at 750:17-22; Appx2187-2191 at 933:13-937:7.

AB&A (and after 2010, IPS) itself—not a code requirement or standard—was responsible for the dimensions for its Classic product line. Appx2925-2926 at 1654:21-1655:23; *see also* Appx2912-2926 at 1641:9-1655:6. Yet AB&A's locknut and cap were compatible with WCM's Innovator overflow elbow, and thus interchangeable with WCM's Innovator locknut and cap—products that Mr. Ball had painstakingly experimented with and perfected. Appx1252-1253 at 156:20-157:15; Appx1423-1430 at 291:24-298:17; Appx1434-1450 at 302:20-318:2. Todd Ricco began working at AB&A in February 2000, Appx1672 at 34:13-19, and eventually became a national sales manager, Appx1672 at 34:24-25, but he never saw an engineering or technical drawing of the Classic product line throughout his employment with AB&A. Appx1680-1681 at 42:5-43:18; *see also* Appx1688 at 50:15-17.

IPS purchased AB&A in August 2010. Appx5577. Following the acquisition, IPS continued to make, import, offer for sale, and sell the Classic product line, without change, as part of its AB&A line. Appx1894 at 640:19-24; Appx2046-2047 at 792:6-793:1. Nicholas Casella, President of IPS's Plumbing Division, had considered purchasing AB&A for years before the 2010 acquisition. Appx2143 at 889:19-22. And Mr. Casella knew that AB&A did not employ engineers or full-time product developers to create the Classic product line. Appx2154 at 900:5-17; Appx2410 at 1156:10-16. Notwithstanding, during the due-

15

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

diligence period for the AB&A acquisition, Mr. Casella did not conduct an investigation into how AB&A developed the Classic product line. Appx2156-2157 at 902:25-903:13.

Mr. Casella was told, however, by Bob Oropallo, co-owner of AB&A and brother of AB&A's president, Anthony Oropallo, that AB&A "monitored their competitors' patents." Appx2157 at 903:14-18. Moreover, IPS was aware of a 2010 patent lawsuit pending between WCM and AB&A at the time of the acquisition, and, in fact, Mr. Casella signed the agreement that ended that litigation. Appx2157-2158 at 903:19-904:9; Appx2159 at 905:16-22. Mr. Casella was aware that WCM had consistently challenged AB&A's copying. Appx2172 at 918:15-25. Recognizing the threat of future infringement claims, IPS obtained and relied on an express ▮▮▮▮▮▮▮▮ from a single company's ▮▮▮—▮▮▮. Appx2169-2173 at 915:16-919:22; Appx5569-5570; Appx6746. And like AB&A before it, IPS continued to ▮▮▮▮▮▮▮▮▮▮ and, in particular, was ▮▮▮▮▮▮▮▮▮▮▮▮ Appx2154-2155 at 900:25-901:6; Appx38; Appx5569. In fact, IPS's Director of Engineering, Jeff Humber, monitored WCM's products throughout his thirty-six years at IPS and possessed catalogs and other literature indicating that WCM's products were marked with "patent pending." Appx2465 at 1211:11-19; Appx2467-2469 at 1213:2-1215:9; Appx38.

## 2.    This Litigation Began in Tennessee

WCM's '220 patent issued on November 6, 2012, although the original application had published no later than 2010. Appx5577. The '970 patent issued on December 4, 2012. *Id.*

On December 11, 2012, WCM sued IPS in the District of Colorado, asserting that IPS's Classic product line infringed both the '220 patent and the '970 patent. Appx5359-5381. But on January 9, 2013, WCM voluntarily dismissed its Colorado complaint before IPS answered. Appx5383-5384. Thus, *this* litigation began with WCM filing a new complaint in the Western District of Tennessee on January 9, 2013—more than two months after the '220 patent issued. Appx4000-4022; *see also* Appx5655 (noting that "the instant litigation began in January 2013").

WCM's '272 patent issued on November 19, 2013, and was later added to the case. Appx5577; Appx258.

## 3.    The District Court's Pretrial Rulings and IPS's Revised Classic Product Line

The district court construed several disputed claim terms before trial. Appx4448-4461. Particularly relevant to the issues in this appeal, the court construed terms related to the claimed "nut" (i.e., the locknut). For example, the court construed the term "[l]ug" as "a lug that detachably engages with the cap." Appx4454. Similarly, the district court construed "[c]ap retention elements" as

17

"'lugs on the nut element for retaining a cap' consistent with the Court's construction of the term 'lugs.'" Appx4455. The court gave variations of the term "radially extending" their "[p]lain and ordinary meaning," *id.*, and construed the term "[d]etachably engage" as "detachably frictionally engaged," Appx4457. The court also expressly found that the scope of "detachably engage" was broad enough to include a snap-fit connection so long as the snap-fit connection satisfied the other requirements of its construction. Appx4413-4418; Appx5551.

In a belated—and ultimately unsuccessful—attempt to avoid infringement, Appx2028 at 774:13-19, IPS released a modified version of its locknut as part of a "Revised Classic" product line in 2014. Appx1254 at 158:1-15.

| original locknut of Classic product line | modified locknut of Revised Classic product line |
|---|---|
|  |  |
| Appx6531 | Appx6533 |

| original locknut from Classic product line (reverse view) | modified locknuts from Revised Classic product line (front view) |
|---|---|
|  | |
| Appx6807 | Appx6808 |

The only difference between the Revised Classic product line and the original Classic product line (sometimes referred to collectively as the "Classic products") is a modified locknut design that no longer includes finger indentations. Appx2026-2028 at 772:23-774:12. But finger indentions are not required by the asserted claims. Thus, the Revised Classic product line became part of this suit too.

Before trial, the district court denied several summary judgment motions, including IPS's motions for summary judgment of no willfulness, invalidity, and noninfringement. Appx5536-5537; Appx 5565. The court also excluded the report and testimony of WCM's expert, Dr. Richard Turley. Appx5564-5565. But in denying IPS's motion for summary judgment, the district court ultimately concluded that "whether the revised locknut infringes under the doctrine of equivalents or literally infringes the asserted patents is an issue for the jury to determine." Appx5553.

### 4.    The Jury Found WCM's Patents Are Valid and IPS Willfully Infringed

The district court held a ten-day jury trial in October 2015, during which WCM presented extensive evidence of IPS's willful infringement. During trial, IPS's expert, Jim Paschal, and IPS's Director of Engineering, Mr. Humber, eventually agreed to the presence of a number of claim elements in the Classic and Revised Classic product lines. Appx1902 at 648:7-19; Appx1909-1915 at 655:22-661:2; Appx1972-1975 at 718:14-721:5; Appx2829-2843 at 1558:13-1572:8. Thus, the infringement dispute at trial focused on a single claim limitation—a locknut with "lugs" that "detachably engage" the inner surface of a cap. IPS Br. 13.

As to IPS's indirect infringement, WCM introduced as evidence the instructions provided with both the Classic product line and the Revised Classic product line (i.e., the modified locknut). Appx6686-6687; Appx6694. Those instructions direct the user to "[p]lace the Overflow plate [i.e., cap] onto the Locknut with the drain slot facing down. Turn the Overflow plate clockwise until it reaches a high point on the locknut." Appx6686-6687; Appx6694.

Steve Kirk, a former Product Manager for the Classic products, Appx1643 at 5:1-16, explained that "[t]he high point of the locknut [is] . . . the most outer diameter on the locknut." Appx1647 at 9:15-19; *see also* Appx1597 at 465:8-9. And Kevin Fink, WCM's Vice-President, demonstrated the installation of IPS's locknuts (including the modified locknut of the Revised Classic product line) and

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

cap while testifying about the reference to the "high points" in IPS's instructions, installing a cap over those "high points," feeling "resistance," and hearing "clicks" as he rotated the cap around the modified locknut. Appx1251 at 155:3-25; Appx1252 at 156:11-19; Appx1255 at 159:3-21; Appx1256-1257 at 160:16-161:17; Appx6686-6687; Appx6694.

WCM also presented evidence that AB&A copied WCM's Innovator product, and that, based on the particular circumstances of IPS's acquisition of AB&A and its later actions, IPS knew or was at least willfully blind to an objectively high risk of infringing the '220, '970, and '272 patents. *See supra* Section III.B.1. This included evidence of a culture of copying at IPS. For instance, the jury heard testimony from former IPS Product Manager Mr. Kirk regarding an email copying Gary Clarke, IPS's Vice-President of Marketing and Engineering, in which Mr. Kirk asked Mr. Humber if IPS could ████████ one of WCM's Watco drains. Appx37-38; Appx1668-1669 at 30:8-31:24; *see also* Appx6688-6693; Appx1664-1668 at 26:22-30:14. What's more, the jury heard testimony from Mr. Humber that he had monitored WCM's products for decades and possessed catalogs and other literature indicating that WCM's products were marked with "patent pending." Appx2465 at 1211:11-19; Appx2467-2469 at 1213:2-1215:9; Appx38. And the jury also heard testimony from WCM's employees explaining that AB&A had copied WCM's Innovator. Appx1605-1608 at 473:14-476:13;

Appx1630-1632 at 498:14-500:12 (Mr. James Engard, a former national sales manager at WCM, discussing a 2008 email from Mr. Ball, Appx6801-6802, describing the Classic product line as an "AB&A knock-off of Innovator"); Appx1822-1823 at 568:17- 569:2 (Mr. Scott Simms, a national sales manager at WCM, Appx1811 at 557:11-16, testifying that the Classic elbow is identical to WCM's Innovator elbow).

After considering all the evidence, the jury found IPS willfully infringed claims 12 and 13 of the '220 patent, claim 1 of the '970 patent, and claims 11-13 of the '272 patent—indeed, all of the claims that were tried. Appx182-213. As to each claim and each accused product, the jury was asked to separately determine whether IPS had "literally infringed," "infringed, under the doctrine of equivalents," "contributorily infringed," or "induced infringement." Appx183-202. The jury found that, as to all claims and all accused "Classic" products, IPS infringed literally, infringed under the doctrine of equivalents, contributorily infringed, and induced infringement. *Id.* The jury found that IPS had not literally infringed the claims as to the accused Revised Classic products. *Id.* But the jury found, as to all claims and all accused Revised Classic products, that IPS infringed under the doctrine of equivalents, contributorily infringed, and induced infringement. *Id.* The jury awarded a reasonable royalty of $1.00 per unit and

found that the total number of infringing units sold by IPS was 1,241,524. Appx211.

For all of the tried claims, the jury also found that WCM proved "by clear and convincing evidence that IPS's infringement was willful and/or that IPS acted with willful blindness." Appx212. Additionally, the jury rejected all of IPS's validity challenges. Appx203-210.

### 5. After Trial, the District Court Upheld IPS's Willfulness, Literal Infringement, and Indirect Infringement, but Set Aside the Jury's Verdict of Infringement Under the Doctrine of Equivalents

In December 2015, the district court granted-in-part and denied-in-part IPS's Rule 50(a) motion for judgment as a matter of law of noninfringement. Appx5647-5658. In granting judgment as matter of law of no infringement under the doctrine of equivalents as to IPS's Revised Classic product line, the court adopted IPS's argument that, "[s]ince WCM did not present *opinion* testimony on infringement, *none* of the evidence introduced at trial is sufficient to prove infringement under the doctrine of equivalents." Appx5653-5654 (emphases added) (footnote omitted). But the court denied IPS's Rule 50(a) challenge to the jury's literal infringement verdict, holding "that WCM presented sufficient evidence for the jury to find literal infringement." Appx5651-5652. Similarly, the district court dismissed IPS's challenge to the jury's indirect-infringement verdict, finding "that WCM provided

23

sufficient evidence from which a reasonable jury could infer inducement of third parties, such as plumbers, to infringe." Appx5654.

The district court also granted-in-part and denied-in-part IPS's Rule 50(a) motion for judgment as matter of law of no willfulness, determining that, because "the instant litigation began in January 2013," "there can be no willfulness with respect to infringement of the '272 Patent," which issued on November 19, 2013. Appx5655. The '220 and '970 patents, however, were "not similarly excluded from the analysis because both were issued prior to January 2013." *Id.* And while the court had "instructed the jury that AB&A's activities prior to IPS's asset acquisition were not evidence of anything IPS did or had knowledge of prior to the acquisition," Appx5655-5656 (citing Appx3185-3186 at 1914:21-1915:3), the court held that "IPS may nevertheless be liable for its own objective recklessness in failing to assess its post-acquisition exposure to infringement allegations," Appx5655-5656. After thoroughly considering WCM's evidence, Appx5656-5657, the district court held "there was sufficient evidence presented for the jury to reasonably conclude by the clear and convincing standard that IPS knew or should have known that there was an objectively high risk of infringement after acquiring AB&A's assets," Appx5657.

IPS also filed a motion to amend the district court's judgment under Fed. R. Civ. P. 59(e), arguing that, because the court had set aside the jury's infringement

24

verdict under the doctrine of equivalents, IPS could not be liable for infringement as to its Revised Classic product line. Appx4-5. The district court disagreed, noting that "[t]here is no requirement . . . that a defendant be the direct infringer in order to be liable for indirect infringement." Appx7 (citing *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2118-19 (2014)). The court also held that "[s]ubstantial evidence was presented that both before and after the locknut was modified in 2014, purchasers of the Classic products were instructed to install the products in a manner that directly infringed." Appx8 n.5.

In May 2016, the district court denied IPS's Rule 50(b) motion for judgment as a matter of law of no literal infringement, no induced infringement, and no contributory infringement. Appx11-25. Once again, the trial court found "there was sufficient evidence from which the jury could infer that lugs were present on the locknuts of the [Classic and Revised Classic product lines]." Appx17. And the court again rejected IPS's argument that contributory infringement required that *IPS* directly infringe, holding instead that "there was sufficient evidence to support the jury verdict of induced and contributory infringement." Appx19.

### 6. The District Court Found Clear and Convincing Evidence of Objective Willfulness and Enhanced Damages

Also in May 2016, the district court rejected IPS's Rule 50(b) motion for judgment as a matter of law of no willful infringement. Appx26-41. Applying the

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO
PROTECTIVE ORDER**

standard in *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007)

(en banc), the court determined that IPS's "invalidity and noninfringement

defenses were not objectively reasonable." Appx32-34. Thus, with the "subjective

*Seagate* prong ... supported by the jury verdict" and the "record evidence

demonstrat[ing] IPS's defenses were not objectively reasonable," the court

determined that "willfulness on the part of IPS has been established," Appx34, by

"clear and convincing evidence," Appx31 (quoting *Seagate*, 497 F.3d at 1371).

"Based on the total record," Appx40, the district court awarded WCM

maximum enhanced damages after carefully considering the factors set out in *Read*

*Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), including whether there was

deliberate copying, whether IPS knew of the patent and had a good-faith belief that

it was invalid, IPS's behavior as a party to the litigation, IPS's size and financial

condition, and the closeness of the willfulness issue. Appx37-41. Taking care not

to attribute "the actions of AB&A" to IPS, the court found there was evidence of

copying by IPS as well. Appx37-38. Even more, IPS had failed to investigate the

asserted patents despite knowing that WCM's products were patent protected and

even ██████████████████████. Appx38-40. The district court also found that

IPS's size and financial condition weighed in favor of awarding enhanced

damages, and that the jury's verdict was "not a 'close call,' because the evidence at

trial strongly supported WCM's case." Appx39-40 (citation omitted). Finding "the

weight of evidence is strongly in favor of enhanced damages," Appx40, and given "the egregious nature of IPS's conduct," the court awarded damages totaling $4,151,934,[5] Appx41.

This appeal followed.

## IV.    SUMMARY OF ARGUMENT

Substantial evidence supports the jury's verdict that IPS directly infringes under the doctrine of equivalents as to the Revised Classic product line. The district court's erroneous rejection of the jury's verdict stems from IPS's insistence that expert testimony is always necessary to prove infringement under the doctrine of equivalents. But such a per se rule has never been adopted by this Court and runs counter to the Supreme Court's instruction that "[e]quivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum." *See Graver Tank*, 339 U.S. at 609. WCM provided substantial evidence that IPS's modified locknut with six high points is substantially equivalent to WCM's claimed locknut with "lugs" that "detachably frictionally engage" the inner surface of a cap, including particularized testimony from persons skilled in the art.

But even if this Court disagrees that substantial evidence supports the jury's verdict of direct infringement under the doctrine of equivalents, IPS's attack on the

---

[5] The district court also issued a permanent injunction. Appx63-65.

jury's indirect-infringement verdict remains unavailing. Indirect infringement requires only that *someone* directly infringe—in this case, IPS's customers. And the district court correctly determined that, regardless of whether IPS itself directly infringes, "[s]ubstantial evidence was presented that both before and after the locknut was modified in 2014, purchasers of the Classic products were instructed to install the products in a manner that directly infringed." Appx8 n.5. At bottom, IPS's only argument for disregarding the jury's indirect-infringement verdict is that the verdict is somehow inconsistent with the rest of the judgment. IPS Br. 25, 28-29. It is not—the jury was entitled to conclude that customers directly infringe when using the Revised Classic product line even if IPS does not directly infringe when making and selling the Revised Classic product line. But even if the jury's indirect-infringement verdict were inconsistent with the rest of the judgment, IPS is not entitled to a one-sided resolution of the inconsistency in its favor. In any event, IPS waived its right to challenge the jury's indirect-infringement verdict as inconsistent when it failed to timely file a motion under Rule 49(b).

IPS's attempt to undermine the district court's enhanced-damages award fares no better. It does not matter that WCM filed this action approximately two months after the '220 patent issued—*Halo* does not provide patentees a per se grace period for willful infringement to mature. In fact, under the totality of the circumstances, this Court has recognized that "pre-patent conduct may also be used

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO
PROTECTIVE ORDER**

to support a finding of willfulness." *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992). The jury found that WCM proved subjective willfulness by clear and convincing evidence, which showed that IPS knew or at least should have known of AB&A's copying of WCM's Innovator product, and that IPS was ███████ and thus had knowledge of WCM's patents. Appx38. Under these circumstances, the district court did not abuse its discretion in awarding enhanced damages, where IPS's defenses as to the tried claims were "not objectively reasonable," Appx32, and that the nature of its conduct was "egregious," Appx41.

## V.    STANDARD OF REVIEW

This Court applies the law of the regional circuit when reviewing a district court's grant or denial of a motion for judgment as a matter of law. *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012). The Sixth Circuit reviews the district court's decision on a motion for judgment as a matter of law de novo. *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). "Judgment as a matter of law may only be granted if, when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Id.* "The evidence should not be weighed, and the credibility of the witnesses

should not be questioned. The judgment of this court should not be substituted for that of the jury . . . ." *Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997).

In the Sixth Circuit, "a district court may alter a judgment under Rule 59 based on (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 551-52 (6th Cir. 2012). A denial of a Rule 59(e) motion is reviewed for an abuse of discretion. *Id.* at 552.

A determination of infringement, both literal and under the doctrine of equivalents, is a question of fact, reviewed for substantial evidence when tried to a jury. *Genentech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1565 (Fed. Cir. 1994).

"Whether infringement is willful is a question of fact, and the jury's determination as to willfulness is therefore reviewable under the substantial evidence standard." *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 822 (Fed. Cir. 1992) (citation omitted). A patentee need only prove willfulness by a preponderance of the evidence. *Halo*, 136 S. Ct. at 1934; *see also WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1363-64 (Fed. Cir. 2016). The district court's ultimate decision to award enhanced damages is reviewed for abuse of discretion. *Halo*, 136 S. Ct. at 1934.

## VI.  ARGUMENT ON WCM'S CROSS-APPEAL

### A.  IPS Led the District Court to Erroneously Create a Per Se Rule That the Doctrine of Equivalents Always Requires Expert Testimony

Despite a jury verdict to the contrary, the district court entered judgment as a matter of law that, for the Revised Classic product line, IPS was not liable for direct infringement under the doctrine of equivalents. Appx5653-5654. According to IPS, the court "agreed that WCM failed to present to the jury, through the particularized testimony of a person of ordinary skill in the art, and on a limitation-by-limitation basis, evidence establishing equivalents." IPS Br. 15-16; *see also* IPS Br. 26. That was not, however, the basis for the district court's judgment. Instead, the court's decision to disregard the jury's verdict hinged on a misapprehension of the law. After noting that it had previously excluded WCM's expert opinion on the doctrine of equivalents,[6] the court held that, "[s]ince WCM did not present *opinion* testimony on infringement, *none* of the evidence introduced at trial is sufficient to prove infringement under the doctrine of equivalents." Appx5653-5654 (emphases added) (footnote omitted). That is, the court adopted a per se rule that "opinion" testimony—and in particular, expert testimony—is *required* to establish equivalency.

---

[6] *See* Appx5653 n.2.

But that is not the law. Both the Supreme Court and this Court "have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, for example 'through testimony of experts *or others versed in the technology*; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.'" *AquaTex*, 479 F.3d at 1329 (emphasis added) (quoting *Graver Tank*, 339 U.S. at 609). While "*typically* a qualified expert" supplies the "particularized testimony of a person of ordinary skill in the art," an expert is not required—a non-expert who is nevertheless a person skilled in the art can provide the required evidence too. *Id.* (emphasis added). Any other rule would read the words "or others" out of the Supreme Court's holding in *Graver Tank* and the word "typically" out of this Court's holding in *AquaTex*.

The root of the district court's error is not a mystery. Notwithstanding its characterization of the standard for evaluating the doctrine of equivalents on appeal, IPS repeatedly supplied the court with an incorrect standard. For instance, IPS told the court that because "opinion testimony *is required* in order to prove infringement under the doctrine of equivalents, WCM has failed to present any legally sufficient evidence that the Accused Products infringe." Appx6788 (emphasis added). IPS also told the court that the phrase "persons of ordinary skill" in the context of a doctrine-of-equivalents analysis is limited to "a hypothetical

person that is used *by an expert* to perform an analysis, but such analysis by its very nature *requires expert testimony*." Appx6798 (emphases added).

IPS is wrong. *See Graver Tank*, 339 U.S. at 609; *AquaTex*, 479 F.3d at 1329. To be sure, establishing infringement under the doctrine of equivalents requires that a person of ordinary skill provide "particularized testimony and linking argument as [to] the equivalence between the claim limitation and the alleged equivalent." *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014) (citing *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)). But neither this Court nor the Supreme Court has ever held that such testimony must always be *opinion* testimony, let alone *expert* testimony. *See Graver Tank*, 339 U.S. at 609 ("Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum."). Even for complex technology, this Court has expressly avoided creating per se rules on expert testimony. *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1370 (Fed. Cir. 2004) ("We do not state a per se rule that expert testimony is required to prove infringement when the art is complex.").

In place of a per se rule requiring opinion testimony from experts, this Court has recognized that "'*objective* evidence rather than unexplained subjective conclusions' may be relevant to the determination whether the differences between the accused product or process and the claimed invention are insubstantial."

*Tex. Instruments*, 90 F.3d at 1566 (quoting *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.*, 62 F.3d 1512, 1519 (Fed. Cir. 1995), *rev'd on other grounds*, 50 U.S. 17 (1997)). For example, "[s]uch [objective] evidence may include evidence of known interchangeability to one of ordinary skill in the art, copying, and designing around." *Id.*; *see also Ring & Pinion Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 834 (Fed. Cir. 2014) ("It has long been clear that known interchangeability weighs in favor of finding infringement under the doctrine of equivalents."). IPS's newly minted per se rule—erroneously adopted by the district court—cannot be reconciled with Supreme Court and Federal Circuit precedent.

### B. Substantial Evidence Supports the Jury's Finding That IPS Directly Infringed WCM's Patents Under the Doctrine of Equivalents by Making and Selling the Revised Classic Product Line

#### 1. WCM Needs Only to Show Sufficient Evidence of Equivalents and Linking Testimony for a Single Claim Element to Sustain the Jury's Verdict

In setting aside the jury's verdict and granting judgment of noninfringement under the doctrine of equivalents, the district court did not actually review the record for substantial evidence, including testimony from persons skilled in the art. Appx5653-5654. Rather, the court simply concluded that, without "*opinion testimony*," "none of the evidence" that WCM presented at trial was "sufficient to prove infringement under the doctrine of equivalents." *Id.* (emphasis added). Applying the correct rule (i.e., that the doctrine of equivalents can be established

34

through the testimony of "others" who are not experts but are nevertheless skilled in the art), however, the jury's verdict that IPS is liable for direct infringement with respect to its Revised Classic product line is supported by substantial evidence.

"In order to arrive at its verdict of infringement under the doctrine of equivalents, the jury must have found that one or more claim elements were met by equivalents, and could have found the remainder of the claim elements were met literally." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998). At trial, IPS's witnesses eventually acknowledged the presence of a number of claim elements in both the Classic product line and the Revised Classic product line. Appx1902 at 648:7-19; Appx1909-1915 at 655:22-661:2; Appx1972-1975 at 718:14-721:5; Appx2829-2843 at 1558:13-1572:8. As a result, the infringement dispute at trial focused on the presence of a single claim limitation—a locknut with "lugs" that "detachably engage" the inner surface of a cap. IPS Br. 13.

At the very least, the jury's literal infringement verdict as to the Classic product line is enough to show that substantial evidence supports IPS's literal infringement with respect to every feature in common between the Classic product line and the Revised Classic product line. The *only* difference between the Revised Classic product line and Classic product line is the modified locknut design. In its post-trial motions, IPS only challenged the presence of a locknut with "lugs" that "detachably frictionally engage" a cap, Appx17-18; Appx5651-5652, and IPS did

35

not appeal the jury's verdict that IPS is liable for literal infringement with respect to its Classic product line.

Thus, for the Revised Classic product line, the only claim limitation for which the jury had not already determined that IPS literally infringes was the limitation requiring a locknut with "lugs" that "detachably frictionally engage" the inner surface of a cap. But, in any event, because "no special verdict interrogatory was used to determine which elements were met literally and which were met equivalently, this court cannot presume to ascertain which elements the jury found to be met only by equivalents." *Comark Commc'ns*, 156 F.3d at 1188. Instead, "this court must uphold the jury verdict if there is sufficient evidence of equivalents and linking testimony such that a reasonable jury could have found that *at least one element* was met by equivalents." *Id.* (emphasis added).

> **2.    Substantial    Evidence—Including    Particularized Testimony from Several Persons of Ordinary Skill in the Art—Support the Jury's Conclusion That the Differences Between IPS's Modified Locknut and the Claimed Locknut Are Insubstantial**

There is sufficient evidence in the record here—including particularized testimony and linking argument from persons of ordinary skill in the art—for a reasonable jury to conclude that IPS's modified locknut has an equivalent to "lugs" that "detachably frictionally engage" a cap. As agreed upon by the parties and explained to the jury, a person of ordinary skill in the applicable art has "(1) at

least a bachelor's degree in a technical field or engineering discipline with at least three years of experience in the plumbing field or (2) at least equivalent experience such as at least eight years of experience in the plumbing industry." Appx3237 at 1966:7-12.[7] Several witnesses meet that standard and offered testimony supporting the jury's verdict of infringement under the doctrine of equivalents.

There is no dispute that Mr. Humber, who began working for IPS in 1978 and is now IPS's Director of Engineering, is a person of ordinary skill in the art under the second prong of the agreed-upon definition. Appx1892 at 638:18-21; Appx1893 at 639:7-10; Appx1992 at 738:14-21. When asked "why did [IPS] modify the locknut" in its Revised Classic product line, Mr. Humber's response was clear:

> A:    Just to take away WCM's perception of any issues that they had with the locknut.
>
> Q:    Okay. So, it was to address claims that were made by WCM?
>
> A:    Yeah.

Appx2028 at 774:13-17. "[D]esigning around" is objective evidence that the differences between the modified locknut and the claimed locknut are insubstantial. *Tex. Instruments*, 90 F.3d at 1566. Moreover, this particularized

---

[7] The district court also instructed the jury on how to apply the doctrine of equivalents. Appx3209-3212 at 1938:20-1941:1; Appx6584-6586.

testimony from a person skilled in the art is specifically linked to a single element—the locknut.

Mr. Humber agreed that "the only change between the original locknut and the second modified locknut is you removed the finger indentations." Appx2028 at 774:5-8.[8] Yet, Mr. Humber also confirmed that removing the finger indentations from IPS's original locknut did not "change *at all* the way that the cap from the Classic product snaps onto the locknut." Appx2058 at 804:2-8 (emphasis added); Appx2059-2060 at 805:7-806:6. In fact, Mr. Humber agreed that the cap snaps on to the modified locknut "the same way" as it snaps on to the original locknut. Appx2058 at 804:9-11; *see also* Appx2058-2060 at 804:12-806:6. In other words, the jury heard testimony from a person skilled in the art that the modified locknut in IPS's Revised Classic product line engages the cap in the exact same way as the original locknut in the Classic product line—a product line for which the jury found IPS liable for literal infringement. Moreover, Mr. Humber confirmed that the modified locknut had six features, "one on every corner point along the locknut," that "are all along the outer periphery of the modified locknut," "on the

---

[8] In its first modification, IPS removed the finger indentations and added two posts for tightening. IPS later removed the posts in a second modification. *See also* Appx2024-2035 at 770:15-781:12; Appx2044-2045 at 790:16-791:7; Appx6532-6533. The addition and later removal of the two posts have no impact on the infringement issues in this case. Appx2050 at 796:7-23; Appx2058 at 804:2-8.

outer circumference of the nut," "in places where the cap fits over the nut." Appx2054 at 800:2-25; *see also* Appx2082 at 828:1-20.

When viewed in the proper context as admissions from an IPS employee, Mr. Humber's testimony is particularly persuasive. In explaining the specific features of the modified locknut, Mr. Humber not only established how IPS's modified locknut engages the cap in the *exact same way* as IPS's original locknut, but also offered particularized testimony directly linking those specific features of the modified locknut to the locknut claimed in WCM's patents. Mr. Humber's testimony also established that the modified locknut is *interchangeable* with IPS's original locknut in the Classic product line—again, a product line for which the jury found IPS liable for literal infringement. Taken together with Mr. Humber's particularized testimony that the modified locknut was created in "designing around" WCM's claims, a reasonable jury could, and in fact did, conclude that the differences between IPS's modified locknut and the claimed locknut are insubstantial.

But that is not all. Mr. Fink's testimony supports the jury's doctrine-of-equivalents verdict too. Mr. Fink, who began working full time at WCM in 1987, is also a person of ordinary skill in the art by virtue of having far more than eight years of experience in the plumbing industry. Appx1169-1171 at 73:20-75:19. Mr. Fink offered testimony directly linking IPS's modified locknut to the claim

limitation requiring a locknut with "lugs" that "detachably frictionally engage." Specifically, Mr. Fink demonstrated the installation of IPS's locknuts (including the modified locknut of the Revised Classic product line) and cap while testifying about the reference to the "high points" in the instructions accompanying IPS's products, installing a cap over those "high points," feeling "resistance" on the high points, and hearing "clicks" as he rotated the cap around the modified locknut. Appx1251 at 155:3-25; Appx1252 at 156:11-19; Appx1255 at 159:3-21; Appx1256-1257 at 160:16-161:17; Appx1259-1260 at 163:8-164:13; Appx1289 at 193:4-8; Appx6686-6687; Appx6694. Mr. Fink also demonstrated and testified that IPS's locknut and cap were compatible with WCM's overflow elbow, and thus interchangeable with WCM's Innovator locknut and cap. Appx1252-1253 at 156:20-157:15; *see also* Appx1845-1846 at 591:9-592:6 (Mr. Simms, national sales manager at WCM, testifying that IPS's locknut was compatible with WCM's elbow and thus, interchangeable with WCM's locknut). "It has long been clear that known interchangeability weighs in favor of finding infringement under the doctrine of equivalents." *Ring & Pinion*, 743 F.3d at 834.

Mr. Fink's particularized testimony and demonstration specifically link the "high points" and "resistance" in IPS's modified locknut to the claimed "lugs" that "detachably frictionally engage," and support the conclusion that any differences are insubstantial. Indeed, a reasonable jury could conclude that the "resistance" and

"clicks" Mr. Fink described while rotating the cap over those "high points," as well as Mr. Fink's removal of the cap, are equivalent to "lugs" that "detachably frictionally engage" a cap. Appx1253-1257 at 157:3-161:17; Appx1259-1260 at 163:8-164:13.

Testimony from Mr. Ball, the inventor of the infringed WCM patents, also supports the jury's verdict of infringement under the doctrine of equivalents. Mr. Ball, who holds a degree in chemical engineering and began working for WCM in 1992, is a person of ordinary skill in the art. Appx1323 at 227:6-22; Appx1324 at 228:8-25; Appx1328 at 232:17-19. Mr. Ball testified regarding the purpose of the lugs of his invention and how the lugs engage the inner surface of a cap. Appx1483 at 351:6-11; Appx1522-1523 at 390:10-391:4. As Mr. Ball explained, the term "frictional engagement" refers to "the resistance" felt "when . . . passing one object over another object" and, more particularly, "the resistance between the cap and the [lock]nut." Appx1522 at 390:17-24. Considered in the full context of the record, Mr. Ball's testimony supports a reasonable jury's conclusion that the difference between the "high points"/"resistance" Mr. Fink described and the claimed "lugs" that "detachably frictionally engage" is decidedly insubstantial.

Additionally, the jury heard testimony from which it could at least infer that substantial portions of the Classic product line were copied from WCM's Innovator product. *See supra* Section III.B.1. For example, Mr. Ricco, a national

sales manager for AB&A, Appx1672 at 34:24-25, and later a regional sales manager at IPS, Appx1675 at 37:17-22, testified that he was not aware of the people at AB&A responsible for product development ever actually "being involved in the process of creating a new product." Appx1675 at 37:7-14; *see also* Appx1636 at 504:8-9; Appx1673 at 35:15-17. Mr. Ricco also testified that he had never seen an engineering or technical drawing of any Classic product throughout his employment with AB&A. Appx1680-1681 at 42:5-43:18; *see also* Appx1685-1688 at 47:23-50:17 (acknowledging that AB&A would identify Watco features that "have some validity" so that AB&A could compete). Mr. Ricco's testimony was corroborated by AB&A's president, Mr. Oropallo, who testified that ABA had *never* employed a single engineer, draftsmen, or full-time product developer. Appx1793 at 539:17-23; *see also* Appx1870-1871 at 616:25-617:12 (Mr. Jaffa, an independent representative for AB&A and IPS, testifying that AB&A had neither engineers nor research and development); Appx1822-1823 at 568:17-569:2(Mr. Simms testifying that the Classic elbow is identical to WCM's Innovator elbow).

Moreover, the compatibility of AB&A's locknuts and caps with WCM's Innovator overflow elbow and the resulting interchangeability was not by accident, nor was it required by a building code or standard. Appx2925-2926 at 1654:21-1655:23; *see also* Appx2912-2926 at 1641:9-1655:20. Mr. Ball had discovered the optimal dimensions and threading for WCM's Innovator products through rigorous

design and testing. Appx1444 at 312:6-15; *see also* Appx1423-1430 at 291:24-298:17; Appx1434-1450 at 302:20-318:2. Because AB&A used the exact same dimensions and threading (on both its overflow elbow and locknut) as WCM, a reasonable jury could infer that AB&A had copied the Innovator. This evidence of copying is additional objective evidence supporting the jury's verdict of infringement under the doctrine of equivalents.

Notwithstanding IPS's assertions to the contrary, WCM was *not* required to present opinion testimony, let alone expert testimony, regarding infringement under the doctrine of equivalents. In addition to receiving actual samples of products,[9] the jury heard particularized testimony from persons of ordinary skill in the art linking the "high points"/"resistance" of IPS's modified locknut to the claimed "lugs" that "detachably frictionally engage." Further, the jury heard objective testimony from persons skilled in the art that the modified locknut and cap were *interchangeable* with WCM's Innovator products, and that the modified locknut itself was *interchangeable* with and functioned in the *exact same way* as IPS's original locknut, part of the Classic product line that resulted in IPS's literal infringement. The jury also heard testimony from IPS's own employee that IPS modified its locknut to *design around* WCM's patent claims, and even heard

_____

[9] Appx5652 (referring to the jury's own examination of the relevant exhibits).

evidence that the Classic product line was copied from WCM's Innovator products.

This body of evidence was more than "sufficient evidence of equivalents and linking testimony such that a reasonable jury could have found that *at least one element* was met by equivalents." *Comark Commc'ns*, 156 F.3d at 1188 (emphasis added); *see also Tex. Instruments*, 90 F.3d at 1566 (noting that "[objective] evidence may include evidence of known *interchangeability* to one of ordinary skill in the art, *copying*, and *designing around*" (emphases added)). Accordingly, the district court's judgment as a matter of law on this point should be reversed and the jury's verdict reinstated.

## VII.  ARGUMENT ON IPS'S APPEAL

### A.    Irrespective of Whether IPS Directly Infringed, Substantial Evidence Supports the Jury's Verdict of Indirect Infringement

In appealing the district court's denial of judgment as a matter of law that IPS does not indirectly infringe as to its Revised Classic product line, IPS does not challenge the fact that its customers actually *use* the Revised Classic product line as intended. Nor does IPS dispute its knowledge or inducement of that use. Instead, IPS's appeal hinges on a single argument: "since it was not established that *the Revised Classic products themselves* directly infringe the asserted patent claims, there was no basis for the jury to conclude that purchasers of IPS's products would

infringe those same patent claims by installing the products." IPS Br. 25 (emphasis added). But the jury was *never asked* to determine whether "the Revised Classic products themselves" infringe—rather, the jury was asked to determine whether *IPS* infringed. Appx183-202. And just because IPS may not have *directly* infringed as to the Revised Classic product line does not mean that IPS did not *indirectly* infringe as to the Revised Classic product line.

If this Court agrees with WCM that the district court erroneously granted judgment as a matter of law that IPS does not directly infringe under the doctrine of equivalents as to its Revised Classic product line, then even under IPS's own flawed theory, its challenge to the jury's indirect-infringement verdict necessarily fails. With the doctrine-of-equivalents verdict restored, IPS would be liable for both direct and indirect infringement as to the Revised Classic product line. But even if this Court declines to reverse the district court's judgment on the doctrine of equivalents, substantial evidence supports the jury's verdict that IPS indirectly infringes as to its Revised Classic product line, even if IPS does not directly infringe.[10]

---

[10] IPS also appears to be challenging the district court's denial of its Rule 59(e) motion. IPS Br. 25 (citing Appx32-34). For the same reasons explained below, the district court did not abuse its discretion.

### 1. IPS Conflates Its Direct Infringement with Direct Infringement by "Others"

IPS is correct that indirect infringement cannot exist "unless s*omeone* has directly infringed." IPS Br. 26 (emphasis added); *see also Limelight Networks*, 134 S. Ct. at 2117 ("[W]here there has been no direct infringement, there can be no inducement of infringement under § 271(b)."). But the law does not require that "someone" to be IPS. *See, e.g.*, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 764 (2011) (defining "contributory infringement" as "the aiding and abetting of directing infringement *by another party*" (emphasis added)); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1303, 1306 (Fed. Cir. 2006) (holding that contributory infringement requires that alleged infringer "engaged in conduct (made sales) within the United States that contributed to *another's* direct infringement," while inducement requires "that the alleged infringer knowingly induced infringement and possessed specific intent to encourage *another's* infringement" (emphases added) (citation omitted)). Indeed, indirect infringement under 35 U.S.C. § 271(b) and (c) would be completely redundant—and useless—causes of action if they required the indirect infringer to be liable for direct infringement under 35 U.S.C. § 271(a).

Nevertheless, IPS turns this well-settled law on its head, arguing that because *IPS* is not a direct infringer after the district court's judgment on the doctrine of equivalents, *nobody* is a direct infringer when it comes to the Revised

46

Classic product line. IPS Br. 27. To get there, IPS asserts that, because the Revised Classic product line is not infringing when sold, IPS is not liable for contributory infringement "when a customer buys and uses" the Revised Classic product line. IPS Br. 27-28.

As an initial matter, the jury was tasked with evaluating *IPS's* liability for infringement, not whether a particular product is infringing or noninfringing in all instances. *See, e.g.*, Appx187 ("Has [WCM] proven by a preponderance of the evidence that IPS has induced infringement . . . ? As to the revised 'Classic' Rough-In Products . . . ."). And the jury found that IPS was in fact liable for indirect infringement as to the Revised Classic product line. In making that determination, the jury necessarily found that *someone* directly infringes each patent. In fact, the jury was expressly instructed to do exactly that:

> There can be no indirect infringement unless someone is directly infringing the patent. Thus, in order to prove that IPS is inducing another person to infringe or contributing to the infringement of another, WCM must prove by a preponderance of the evidence that the other person is directly infringing at least one claim of the patent.

Appx3212 at 1941:11-17; Appx6587.

Even accepting the conclusion that IPS is not liable for direct infringement when it makes or sells the Revised Classic product line, nothing prevented the jury from finding that a third party directly infringed while using or installing those same products. IPS never requested such an instruction, which would have been

legally erroneous. There are reasons why a jury could find that IPS's customers directly infringed even if IPS did not. For instance, the Revised Classic product line includes a modified locknut. Appx2026-2028 at 772:23-774:12. The jury may have concluded that the "lugs" on the modified locknut do not actually "detachably frictionally engage" the cap until the customer follows IPS's directions to "[p]lace the Overflow plate onto the Locknut with the drain slot facing down" and "[t]urn the Overflow plate clockwise until it reaches a high point on the locknut." Appx6686-6687; Appx6694; *see also* Appx226 at claim 12 ("said nut element having an outer periphery with a series of radially extending lugs *that detachably engage an inner surface* of a cap that fits over said nut" (emphasis added)). Indeed, the jurors had physical samples of the Classic and Revised Classic products, which they could assemble and dissemble in their deliberations. Appx17.

But, affirming the jury's indirect-infringement verdict does not require such speculation. For one thing, the verdict form did not ask the jury to identify the sources of direct infringement for which its indirect-infringement verdict was based. And as the district court noted, "IPS never requested a question on the verdict form that would have required the jury to do so." Appx8 n.5. What's more, the verdict form did not ask the jury to determine whether IPS's indirect infringement was predicated on direct acts of literal infringement or direct infringement under the doctrine of equivalents. In proving indirect infringement,

the requisite direct infringement may be established "either literally or under the doctrine of equivalents." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2004). So even if this Court affirms the district court's judgment with respect to the doctrine of equivalents, it must also affirm the jury's indirect-infringement verdict as to the Revised Classic product line if substantial evidence supports literal infringement by someone other than IPS.

## 2.    IPS Has Waived Any Argument That the Jury's Verdicts Are Inconsistent

At its core, IPS's real argument is that, without a judgment that IPS directly infringes as to the Revised Classic product line, the jury's indirect-infringement verdict is an "illogical" judgment and results in a "legal impossibility." IPS Br. 25. In other words, IPS argues that the jury's verdicts are inconsistent. But IPS insisted before the district court that "it did not believe that there were inconsistencies in the verdict." Appx9. IPS had no choice—it failed to bring a Rule 49(b) motion, *id.*, and thus waived the issue altogether. *See Nolfi*, 675 F.3d at 552 ("Our precedent requires a party to bring a Rule 49(b) motion when there is an inconsistency, which plaintiffs failed to do. A party that fails to do so has waived its right to object."); *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 243 F.3d 1316, 1325 (Fed. Cir. 2001) ("The Federal Circuit applies the law of the regional circuit . . . to the issue of

49

inconsistent verdicts."). IPS should not be allowed to resurrect a Rule 49(b) argument disguised as an appeal from the denial of judgment as a matter of law.[11]

Even if IPS's Rule 49(b) argument were properly preserved (which it is not), IPS faces a steep burden in showing that the jury's verdicts are truly inconsistent. "Federal law favors the harmonization of verdicts and answers to interrogatories *wherever that is reasonably possible*." *Jewell v. Holzer Hosp. Found., Inc.*, 899 F.2d 1507, 1510 (6th Cir. 1990) (emphasis added). "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962).

---

[11]  IPS filed its Rule 50(a) motion for judgment as a matter of law of noninfringement under the doctrine of equivalents on October 19, 2015. Appx5647. And now, IPS appears to erroneously argue that in partially granting IPS's Rule 50(a) motion on December 4, 2015, the court somehow made the jury's indirect-infringement verdict inconsistent with the rest of the judgment. But in any event, the timing of the court's Rule 50(a) decision does not excuse IPS from its failure to timely file a motion under Rule 49(b). Knowing that its Rule 50(a) motion on the doctrine-of-equivalents issue was pending as the jury deliberated, IPS could have filed a Rule 49(b) motion immediately after the jury returned a verdict on October 27, 2015. Instead, IPS waited until December 14, 2015, to file a motion to amend the judgment under Rule 59(e). Appx2.

Only where harmonization is not possible should a verdict be labeled "inconsistent." For example, this Court has held a jury verdict inconsistent where the jury found a dependent claim obvious while finding all other claims, including the independent claim from which the obvious claim depends, not invalid. *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009). But here, the jury's verdict that IPS is liable for indirect infringement as to its Revised Classic product line is not predicated on *IPS* being liable for direct infringement— indirect infringement here stands on its own, supported by substantial evidence that IPS's customers literally infringe.

### 3. Under the Correct Law for Indirect Infringement, Substantial Evidence Supports the Jury's Determination That Others Directly Infringed by Using the Revised Classic Product Line, Even If IPS Itself Did Not Directly Infringe When It Made and Sold the Revised Classic Product Line

This Court has recognized that "[c]ertainly, it would be inappropriate to grant JMOL solely to rationalize inconsistent verdicts." *Mycogen*, 243 F.3d at 1325. Even if the verdicts were inconsistent as IPS argues (they are not), IPS cannot sidestep its Rule 49(b) waiver now by framing what is fundamentally an inconsistency argument as a judgment-as-a-matter-of-law dispute. Thus, this Court should reject IPS's *inconsistent* inconsistency arguments. *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302-04 (Fed. Cir. 2002) (holding that defendant was judicially estopped from arguing that the verdict was inconsistent

51

where the defendant argued before the trial court that the verdict was not irreconcilable). Nevertheless, to the extent that IPS's argument amounts to a claim of insufficient evidence supporting the jury's verdict that IPS indirectly infringes— and more specifically, that *others directly infringe*—it still falls flat.

"This [C]ourt has upheld claims of indirect infringement premised on circumstantial evidence of direct infringement by unknown parties." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1318 (Fed. Cir. 2009)). And "when an alleged infringer 'instructs users to use a product in an infringing way, there is sufficient evidence for a jury to find direct infringement.'" *Convolve, Inc. v. Compaq Comput. Corp.*, 527 F. App'x 910, 929 (Fed. Cir. 2013) (quoting *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1366 (Fed. Cir. 2012)).

The jury's indirect-infringement verdict is supported by substantial evidence that others literally infringe as to the Revised Classic product line. At trial, WCM introduced as evidence the instructions provided with both the Classic product line and the Revised Classic product line (i.e., the modified locknut). Appx6686-6687; Appx6694. In those instructions, IPS directs users to "[p]lace the Overflow plate [i.e., cap] onto the Locknut with the drain slot facing down. Turn the Overflow plate clockwise until it reaches a high point on the locknut." Appx6686-6687;

Appx6694. WCM presented substantial evidence that, when a user turns the "Overflow plate" (i.e., the cap) over those high points of the modified locknut, the user/installer is literally infringing. *See, e.g.*, Appx1251 at 155:3-25; Appx1252 at 156:11-19; Appx1255 at 159:3-21; Appx1256-1257 at 160:16-161:17; Appx2058-2060 at 804:9-806:6. Moreover, the jurors had physical samples of the Classic and Revised Classic product lines—including the modified locknut—during their deliberation, allowing them to turn the overflow plate over the high points as IPS instructs and feel the engagement. Appx17. IPS does not point to a single unsatisfied claim limitation when its customers follow IPS's own instructions to install the Revised Classic product line.

IPS asserts that the district court cited only a "few snippets of testimony," IPS Br. 29, supporting its conclusion that "[s]ubstantial evidence was presented that both before and after the locknut was modified in 2014, purchasers of the Classic products were instructed to install the products in a manner that directly infringed." Appx8 n.5. IPS is wrong—the court in fact cited *many* portions of the record, including IPS's actual instructions and testimony from IPS's own witness, Mr. Humber, that IPS did not change its instructions when it introduced the modified locknut in the Revised Classic product line. *See id.* (citing, among other things, Appx1955-1956 at 701:17-702:11; Appx2024-2025 at 770:17-771:6 (Q: "Okay. But IPS didn't change the instructions for installation after it modified the

locknut, right?" A: "I don't believe they did."); Appx6686 (instructing the purchaser to turn the overflow plate until it reaches a "high point")); *see also* Appx6687; Appx1255 at 159:3-21.

Substantial evidence shows that customers also used IPS's "rough-in" products (i.e., an early-stage kit that includes an overflow elbow, a sealing washer, and a locknut) to directly infringe. Mr. Humber testified that after installation, "they come back and trim it out." Appx1938-1939 at 684:24-685:5. To "finish the installation for the overflow," Mr. Humber explained, "[t]hey would buy the finish kit which includes the stopper and the cover plate." Appx1939-1940 at 685:25-686:12. In fact, Mr. Humber was not aware of "any installations that have been made of IPS's Classic products that just didn't have the cover plate." Appx1955 at 701:2-24; *see also* Appx2004-2007 at 750:17-753:11 (IPS sells specific trim kits with covers for all its Classic products). Similarly, Mr. Simms, who has visited numerous construction sites, testified that he has never seen a "completely finished" overflow assembly that did not have a decorative cap. Appx1825-1826 at 571:7-572:13.

Further, Mr. Kirk testified that IPS sold "[f]inish kits that would go with what we called our Classic half and full kits" because "[o]ur customers asked us to." Appx1651 at 13:1-8. He explained that the finish kits could not be used with the traditional one-screw or two-screw overflow designs. Appx1651-1652 at 13:9-

14:9. And WCM presented evidence that IPS sold substantially similar amounts of the Classic half-kit rough-ins and the trim kits used to complete them. Appx2004 at 750:17-22; Appx2187-2191 at 933:13-937:7; Appx5654; Appx6766-6772 at Appx6769.

IPS has not rebutted any of this evidence. But even if IPS could point to other evidence that supports its position, that is not enough to set aside the jury's verdict. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016) (en banc) ("Our job is not to review whether Samsung's losing position was also supported by substantial evidence or to weigh the relative strength of Samsung's evidence against Apple's evidence. We are limited to determining whether there was substantial evidence for the jury's findings, on the entirety of the record.").

For all of these reasons, this Court should affirm the district court's denial of IPS's motions challenging the jury's indirect-infringement verdict with respect to the Revised Classic product line. Further, this Court should decline IPS's invitation to vacate the district court's permanent injunction and adjust the jury's damages award to remove the Revised Classic product line.

**B.    Substantial Evidence Supports the Willfulness Verdict, Which the Jury Reached Even Applying the More Exacting "Clear and Convincing" Standard**

In *Halo*, the Supreme Court held that the "subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless." 136 S. Ct. at 1933. The Supreme Court noted that "culpability is generally measured against the knowledge of the actor at the time of the challenged conduct," and that "a person is reckless if he acts '*knowing* or *having reason to know* of facts which would lead a reasonable man to realize' his actions are unreasonably risky." *Id.* (quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)). This Court has recognized that "*Halo* did not disturb the substantive standard for the second prong of *Seagate* . . . , i.e., proof that the defendant acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer.'" *WesternGeco*, 837 F.3d at 1362 (quoting *Halo*, 136 S. Ct. at 1930); *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) (observing that the *Halo* decision did not disturb the "established law that the factual components of the willfulness question should be resolved by the jury"). *Halo* did, however, change the burden for proving "recklessness" from "clear and convincing evidence" to just "a preponderance of the evidence." 136 S. Ct. at 1934 (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014)).

IPS ignores *Halo*'s lower evidentiary burden for proving subjective willfulness altogether, making no effort to reconcile its appeal with the fact that WCM proved "by clear and convincing evidence" that IPS willfully infringed.[12] Appx212. Instead, IPS argues that, because there were thirty-five days between the issuance of the '220 patent and WCM's Colorado complaint, IPS cannot be liable for willful infringement. IPS Br. 32-34.

As an initial matter, IPS is wrong in asserting that, "per the district court's ruling," the "relevant time period . . . was the period predating WCM's filing of its Colorado complaint." IPS Br. 36. In fact, when considering IPS's motion for judgment as a matter of law of no willfulness, the court expressly determined that "the instant litigation began in *January 2013*." Appx5655 (emphasis added). So notwithstanding IPS's frequent reference to "35 days," the time between the issuance of the '220 patent on November 6, 2012, and "the instant litigation" was actually more than 60 days. And even before the '220 patent issued, the Patent Office published a Notice of Allowance on September 20, 2012—more than three months before the instant litigation began. Appx6677-6680; Appx1240-1241 at

---

[12] The jury was asked whether "WCM [has] proven by clear and convincing evidence that IPS's infringement was willful and/or that IPS acted with willful blindness." Appx212. The "willful blindness" standard "surpasses recklessness and negligence." *Global-Tech*, 563 U.S. at 769. IPS challenges neither the verdict form, Appx212, nor the jury instruction, Appx3246-3247; Appx6631-6634, on willfulness.

144:2-145:19; *see also* Appx6681-6685. Moreover, WCM's Colorado complaint filed on December 11, 2012, provided direct and express notice to IPS of WCM's infringement allegations before "the instant litigation" even started. Yet IPS presented no evidence at trial that it took any action to stop infringing before WCM filed the instant action in Tennessee.

But regardless of whether this litigation began in December 2012 or January 2013, there is no per se rule requiring a specific amount of time after a patent issues before infringement is willful. Such a rule could not be squared with the Supreme Court's rejection of *Seagate*'s rigid framework, nor its instruction that courts should "take into account the particular circumstances of each case in deciding whether to award damages." *Halo*, 136 S. Ct. at 1933.

In fact, this Court has expressly declined to create a per se rule "that an infringer must be allowed a certain amount of time to 'develop' willfulness." *Ralston Purina Co. v. Far-Mar-Co, Inc.*, 772 F.2d 1570, 1577 (Fed. Cir. 1985) ("[W]e will not supply it."). IPS's reliance on *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed. Cir. 1985), and *Gustafson, Inc. v. Intersystem Industrial Products, Inc.*, 897 F.2d 508 (Fed. Cir. 1990), is unavailing—neither case creates the per se rule that IPS advocates. *State Industries* simply notes that, "[t]o willfully infringe *a patent*, the patent must exist and one must have knowledge of it." 751 F.2d at 1236. But nothing in *State Industries* precludes

willfulness based solely on the timing of issuance where substantial evidence otherwise supports willful infringement. Similarly, *Gustafson* does not purport to establish a per se rule either, but instead instructs that a willful intent "must be inferred from *all the circumstances*." 897 F.2d at 510-11 (emphasis added). "[I]n respect of willfulness, there cannot be hard and fast *per se* rules." *Id.* at 510 (quoting *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986)).

As an alternative to its new per se rule, IPS takes a "scatter-gun" approach, *Fromson v. Citiplate, Inc.*, 886 F.2d 1300, 1302 n.2 (Fed. Cir. 1989), sweeping aside evidence considered by the jury and essentially seeking to "retry [its] case[] on appeal," *id.* at 1302, asking this Court to undertake an entirely new "totality of the circumstances" analysis. IPS Br. 36-40. IPS's arguments boil down to a simple disagreement with the jury's verdict. But that is not enough to prevail where substantial evidence supports the jury's conclusion that IPS's infringement was subjectively willful—in other words, that IPS "acted despite a risk of infringement that was 'either known or so obvious that it should have been known to the accused infringer.'" *WesternGeco*, 837 F.3d at 1362 (quoting *Halo*, 136 S. Ct. at 1930).

For instance, Mr. Casella, President of IPS's Plumbing Division, knew that AB&A did not employ engineers or full-time product developers to create the Classic product line. Appx2154 at 900:5-17; Appx2410 at 1156:10-16.

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

Nevertheless, Mr. Casella did not conduct an investigation into how AB&A developed the Classic product line during the due-diligence period. Appx2156-2157 at 902:25-903:13. WCM established at trial that Mr. Ball had meticulously devised the Innovator product, and the only rational explanation for the Classic products' identical measurements and compatibility was that AB&A had copied the Innovator.

Moreover, IPS was aware of a 2010 patent lawsuit between WCM and AB&A at the time of the acquisition, and in fact, Mr. Casella signed the agreement that ended the litigation. Appx2157-2158 at 903:19-904:9; Appx2159 at 905:16-22. Recognizing the threat of future infringement claims, IPS obtained, and eventually relied on, AB&A's specific ███████████ from a single company's ████ — ████. Appx2169-2173 at 915:16-919:22; Appx5569-5570; Appx6746. Notwithstanding, IPS continued to ████████████████████ and, in particular, was ████████████████████ Appx38; Appx2154-2155 at 900:25-901:6; Appx5569. Mr. Humber testified that he had monitored WCM's products for decades and possessed catalogs and other literature indicating that WCM's products were marked with "patent pending." Appx2465 at 1211:11-19; Appx2467-2469 at 1213:2-1215:9; Appx38. WCM also introduced evidence of a culture of copying at IPS, including testimony from Mr. Kirk, former IPS Product Manager, asking if he could ████████ one of WCM's Watco drains. Appx37-38;

Appx1668-1669 at 30:8-31:24; Appx6688-6693; *see also* Appx6803-6806 (email chain including Mr. Jaffa, Mr. Kirk, and Mr. Cassella demonstrating IPS's state of mind and practices as to copying WCM's products); Appx2211-2217 at 957:10-963:17. The jury was not required to accept IPS's rationalization of these comments.

This was enough to prove to the jury by *clear and convincing* evidence that IPS's infringement was subjectively willful. Context matters. "The Federal Circuit has indicated while describing its totality of the circumstances analysis that 'although willfulness is generally based on conduct that occurred after a patent issued, pre-patent conduct may also be used to support a finding of willfulness.'" Memorandum Opinion & Order at 7, *Malibu Boats, LLC v. MasterCraft Boat Co.*, No. 3:16-CV-82-TAV-HBG (E.D. Tenn. Oct. 28, 2016), ECF No. 43 (quoting *Minn. Mining*, 976 F.2d at 1581); *see also Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-79 (Fed. Cir. 1986) (applying the "totality of the circumstances" approach and refusing to overturn a finding of willfulness where the allegedly improper copying "took place *before* the patent was issued").

While the district court held that the actions of AB&A before IPS's acquisition were not attributable to IPS, the jury was expressly entitled to consider as evidence the knowledge of AB&A managers who later became managers at IPS

**CONTAINS CONFIDENTIAL INFORMATION PURSUANT TO PROTECTIVE ORDER**

after the acquisition.[13] Appx3185-3186 at 1914:21-1915:3. Even more, IPS's own objective recklessness in failing to assess its post-acquisition exposure to infringement allegations is a particular circumstance of this case. Appx5656-5657. Recognizing that AB&A had been accused of copying WCM in the past, IPS knew it would face infringement problems with WCM down the road. That IPS was aware of this risk is clear from the fact that it obtained a specific ████████ from ████████████, but only expressly as to ████████.

Notwithstanding these risks, IPS did not change its Classic product line. IPS continued, however, to ████████████. Appx38. In fact, the jury had enough evidence to conclude that IPS, through ████████████, knew of the '220 patent's imminent issuance at least by September 20, 2012, when the Patent Office issued a Notice of Allowance. Appx38; Appx5569; Appx6677-6680; Appx1240-1241 at 144:2-145:19; *see also Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1193 (Fed. Cir. 1996) (holding that filing suit on the day the patent

---

[13] For example, Mr. Ricco, a national sales manager for AB&A, Appx1672 at 34:24-25, and later a regional sales manager at IPS, Appx1675 at 37:17-22, testified that he was not aware of the people at AB&A responsible for product development ever actually "being involved in the process of creating a new product." Appx1675 at 37:7-14; *see also* Appx1636 at 504:8-9; Appx1673 at 35:15-17. Mr. Ricco also testified that he had never seen an engineering or technical drawing of any Classic product throughout his employment with AB&A. Appx1680-1681 at 42:5-43:18; *see also* Appx1685-1688 at 47:23-50:17 (acknowledging that AB&A would identify Watco features that "have some validity" so that AB&A could compete).

issued did not preclude a finding of willfulness, where the defendant "knew exactly when [the] patent came into existence, and indeed had several months' advance notice"). Yet even with knowledge of WCM's '220 patent, IPS did nothing. IPS's assertion that it too has a patent directed to its Classic product line is irrelevant, IPS Br. 38—whether IPS has a patent has nothing to do with its willful infringement of *WCM*'s patents.

IPS's post-litigation conduct supports the jury's willfulness finding as well. The district court held, relying on *Seagate*, 497 F.3d at 1374, that IPS's post-litigation conduct did not create a genuine issue of material fact as to willfulness because WCM did not move for a preliminary injunction. Appx5556-5557. But *Seagate* did not create a per se rule where a willfulness claim is based on conduct occurring both after *and before* the litigation commences. *Seagate*, 497 F.3d at 1374 (in the context of assessing waiver of attorney-client privilege, questioning the accruement of "enhanced damages based *solely* on infringer's post-filing conduct" (emphasis added)). Neither does *Halo*. 136 S. Ct. at 1933 (instructing courts to "take into account the particular circumstances of each case in deciding whether to award damages").

Here, IPS did not take steps to avoid infringement until 2014—well over a year after the litigation began. Appx1254 at 158:1-5; Appx1900-1901 at 646:23-647:1. And even then, its changes were futile. IPS introduced a single modification

to its locknut (i.e., removing finger holds), but did not meaningfully change how the modified locknut engages a cap. Appx2058 at 804:9-11; *see also* Appx2058-2060 at 804:12-806:6. Indeed, the jury still found that IPS was liable for indirect infringement as to the Revised Classic product line, which differs only from the original Classic product line in that it included IPS's modified locknut. Appx2026-2028 at 772:23-774:12. What's more, it is undisputed that IPS *continued to sell* its original Classic product line despite its attempted redesign. Appx2222-2223 at 968:16-969:23. Thus, IPS's post-litigation conduct further supports the jury's finding that IPS's infringement was willful.

At bottom, the jury had more than enough evidence to conclude that IPS knew of WCM's patents as they issued (if not earlier), and that the risk of infringement was known to IPS or so obvious that it should have been known. This is especially true where, under *Halo*, WCM only needed to supply a "preponderance of the evidence." *See Stryker*, 837 F.3d at 1279 ("The jury made its determination under the clear and convincing evidence standard, which is a higher standard than is now necessary. We therefore affirm the jury's finding of willful infringement."). As the district court noted, this case was "not a 'close call,' because the evidence at trial strongly supported WCM's case." Appx39-40 (citation omitted). Accordingly, the jury's willfulness verdict should not be disturbed.

### C.    The District Court Did Not Abuse Its Discretion in Trebling Damages Given the Particular Circumstances of This Case and IPS's Egregious Conduct

In arguing that the district court's judgment of enhanced damages must be reversed, IPS makes no mention of the abuse-of-discretion standard required under *Halo*. Instead, IPS asserts that this case is really not as one-sided as the district court believed, and that this Court should undertake its own review of the record. IPS Br. 40-41. That is not how the abuse-of-discretion standard works. Rather, it requires "definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989).

In *Halo*, the Supreme Court looked to its decision in *Octane Fitness* for the relevant standard to apply for enhancing damages. While there is "'no precise rule or formula' for awarding damages under § 284, a district court's 'discretion should be exercised in light of the considerations' underlying the grant of that discretion." *Halo*, 136 S. Ct. at 1932 (quoting *Octane Fitness*, 134 S. Ct. at 1756). "As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Id.* at 1933. Enhanced damages "should generally be reserved for egregious cases typified by willful misconduct." *Id.* at 1934.

The district court here carefully considered the factors in *Read*, 970 F.2d 816, and applied them to the particular circumstances of this case. Appx26-41; *see*

*also supra* Section III.B.6. Having presided over a ten-day trial and volumes of briefing, the district court was uniquely situated to determine the merits of IPS's defenses. Its conclusion? IPS's conduct was "egregious," Appx41, and the jury's verdict was "not a 'close call,' because the evidence at trial strongly supported WCM's case," Appx39-40 (citation omitted). The court also expressly concluded that WCM had demonstrated, by clear and convincing evidence, that "IPS's defenses were not objectively reasonable." Appx34. As one example, when asked on cross-examination whether "any of the references that you considered [are] anticipatory references," IPS's expert, Mr. Paschal responded, "I don't know." Appx2689:13-15. "After *Halo*, the objective reasonableness of the accused infringer's positions can still be relevant for the district court to consider when exercising its discretion." *WesternGeco*, 837 F.3d at 1363.

IPS's main argument for disregarding the district court's analysis is that, because some of WCM's infringement claims were inevitably dropped along the way, the court abused its discretion in finding that this case was "not close." Not surprisingly, IPS does not cite a single authority in support of its position. Under IPS's rule, patentees would refuse to streamline their cases before trial, worried that they might compromise their willfulness case in the process. The issue here— and the issue the jury decided—is whether IPS has willfully infringed the *tried* claims, not whether IPS willfully infringed other claims. Thus, the district court did

not abuse its discretion in focusing on the "egregious nature of IPS's conduct," Appx41, as to the claims that WCM actually asserted at trial.

### D. The District Court Did Not Abuse Its Discretion in Awarding Enhanced Damages as to the Revised Classic Product Line

At the end of its brief, IPS makes a passing argument—without citing any authority—that the district court's enhanced-damages award is "erroneous" because it included "enhancement of the damage award attributable to the Revised Classic [p]roduct line." IPS Br. 41-42.

IPS is wrong again. The district court did not abuse its discretion in awarding "damages up to three times the amount found or assessed." 35 U.S.C. § 284. Neither *Halo* nor § 284 require the district court to allocate enhanced damages on a product-by-product basis. *See Halo*, 136 S. Ct. at 1931 ("That language contains no explicit limit or condition, and we have emphasized that the word 'may' clearly connotes discretion."). The jury was not asked to decide willfulness on a product-by-product basis. Appx212. Indeed, this is the first time that IPS has raised the argument that damages with respect to the Revised Classic product line cannot be enhanced because that product line was introduced during the litigation. "[L]egal issues in patent infringement suits are not immune to the doctrine of waiver on appeal, and except for certain circumstances, those issues not

raised below at the district court cannot be heard for the first time on appeal." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358 (Fed. Cir. 2006).

Even if this Court were to consider this argument, IPS fundamentally misunderstands the district court's decision at summary judgment. Under the framework of *Halo*, IPS's post-litigation conduct is in fact relevant to the particular circumstances of the willfulness analysis and provides additional evidence supporting both the jury's finding of subjective willfulness and the district court's enhanced-damages award. *See supra* Section VII.B, at 61-62. But even accepting the district court's decision to disregard IPS's post-litigation conduct in determining whether IPS's infringement was willful, Appx5556-5557, IPS still misses the mark. The court did not, as IPS suggests, hold that post-litigation conduct was entirely immune from enhanced damages. Under IPS's flawed logic, *none* of IPS's sales after January 2013 would be subject to enhanced damages, even sales of its Classic product line. It does not matter that the Revised Classic product was introduced during the litigation as a failed attempt to avoid infringement—the jury found IPS liable for infringement as to its Revised Classic products too.

In sum, the district court did not abuse its discretion in awarding "damages up to three times the amount found or assessed." 35 U.S.C. § 284.

## VIII. CONCLUSION

This Court should reverse the district court's judgment as a matter of law that IPS does not infringe under the doctrine of equivalents with the Revised Classic product line, which was based on an erroneous per se rule.

Additionally, this Court should affirm the jury's indirect-infringement verdict for the Revised Classic product line, as well as the district court's permanent injunction. This Court should also affirm the jury's willfulness verdict and the district court's enhanced-damages award in full.

Date: November 29, 2016                    Respectfully submitted,


                                       /s/ J. Michael Jakes
                                      J. Michael Jakes
                                      Kathleen A. Daley
                                      Jason L. Romrell
                                      FINNEGAN, HENDERSON, FARABOW,
                                        GARRETT & DUNNER, LLP
                                      901 New York Avenue, NW
                                      Washington, DC 20001-4413
                                      (202) 408-4000

                                      Attorneys for Plaintiff-Cross-Appellant
                                      WCM Industries, Inc.

## CERTIFICATE OF SERVICE

I certify that on November 29, 2016, this CORRECTED NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF OF PLAINTIFF-CROSS-APPELLANT WCM INDUSTRIES, INC., was filed electronically using the CM/ECF system and served via the CM/ECF system on counsel for Defendant-Appellant as follows:

> David J. Silvia
> Lock Lorde LLP
> One Canterbury Green
> 201 Broad Street
> Stamford, Connecticut 06901

/s/ J. Michael Jakes

## CERTIFICATE OF COMPLIANCE

I certify that this CORRECTED NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF OF PLAINTIFF-CROSS-APPELLANT WCM INDUSTRIES, INC., contains 15,166 words as measured by the word-processing software used to prepare this brief.

/s/ J. Michael Jakes

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

WCM INDUSTRIES, INC.,   )
   )
        Plaintiff,   )   CIVIL ACTION NO.: 2:13-cv-02019-JPM-dkv
   )
v.   )
   )   Jury Trial Demanded
IPS CORPORATION,   )
   )
        Defendant.   )
   )

---

ORDER GRANTING IN PART AND DENYING IN PART
IPS'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW
OF NONINFRINGEMENT AND OF NO WILLFULNESS

---

Before the Court are Defendant IPS Corporation's ("IPS") Motion for Judgment as a Matter of Law of Noninfringement (ECF No. 435) and Motion for Judgment as a Matter of Law of No Willfulness (ECF No. 436), both filed on October 19, 2015. The Court, having considered IPS's Motions, hereby GRANTS IN PART and DENIES IN PART IPS's Motion for Judgment as a Matter of Law of Noninfringement and GRANTS IN PART and DENIES IN PART IPS's Motion for Judgment as a Matter of Law of No Willfulness.

I.  **BACKGROUND**

Plaintiff WCM Industries, Inc. ("WCM") brought claims for patent infringement against Defendant IPS, alleging that IPS infringed claims in three of WCM's patents.[1]  (Joint Pretrial

---

[1] The three patents at issue are U.S. Patent No. 8,302,220 ("the '220

Order at 2, ECF No. 424.)  IPS denied that it infringed the

patents and also asserted claims that WCM's patents were

invalid.  (Id.)

For ten days between October 13, 2015, and October 27,

2015, a jury trial was held.  (ECF Nos. 430, 432-434, 439, 441,

444, 447, 451, 453.)  At the close of WCM's case-in-chief on

October 19, 2015, IPS moved for judgment as a matter of law of

noninfringement and no willfulness.  (ECF Nos. 435, 436, 439.)

On October 27, 2015, the jury returned a verdict for WCM,

finding that IPS had literally infringed, infringed under the

doctrine of equivalents, contributorily infringed, or induced

infringement of each asserted claim, and that the asserted

claims were not invalid.  (Verdict Form at 2-26, ECF No. 454.)

The jury also found that IPS infringed willfully.  (Id. at 31.)

## II. LEGAL STANDARD

Rule 50 of the Federal Rules of Civil Procedure provides

that a court may grant a motion for judgment as a matter of law

when "a party has been fully heard on an issue during a jury

trial and the court finds that a reasonable jury would not have

a legally sufficient evidentiary basis to find for the party on

that issue."  Fed. R. Civ. P. 50(a)(1); accord Interactive

---

Patent"); U.S. Patent No. 8,321,970 ("the '970 Patent"); and U.S. Patent No.
8,585,272 ("the '272 Patent").  (Joint Pretrial Order at 2, ECF No. 424.)
The IPS products that WCM alleges infringe WCM's patents ("the Accused
Products") include the original "Classic" line and the revised "Classic" line
of bathtub overflow and drain assemblies.  (See id. at 3-4.)

Pictures Corp. v. Infinite Pictures, Inc., 274 F.3d 1371, 1375

(Fed. Cir. 2001) (quoting Fed. R. Civ. P. 50(a)).  Since the

grant or denial of judgment as a matter of law is not uniquely a

patent issue, the law of the regional circuit is applied.  See

Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1309 (Fed.

Cir. 2009).  In the Sixth Circuit,

> [j]udgment as a matter of law may only be granted if,
> when viewing the evidence in a light most favorable to
> the non-moving party, giving that party the benefit of
> all reasonable inferences, there is no genuine issue
> of material fact for the jury, and reasonable minds
> could come to but one conclusion in favor of the
> moving party.

Barnes v. City of Cincinnati, 401 F.3d 729, 736 (6th Cir. 2005),

cert. denied, 546 U.S. 1003 (2005).  A court should "not

substitute [its] interpretation of the evidence for the jury's,

even if [it] would have reached a different conclusion."  Static

Control Components, Inc. v. Lexmark Int'l, Inc., 697 F.3d 387,

414 (6th Cir. 2012) (citing Barnes, 401 F.3d at 738).

    "A determination of infringement, both literal and under

the doctrine of equivalents, is a question of fact, reviewed for

substantial evidence when tried to a jury."  TI Grp. Auto. Sys.

(N. Am.), Inc. v. VDO N. Am., L.L.C., 375 F.3d 1126, 1133 (Fed.

Cir. 2004).  Infringement may be found based on direct or

circumstantial evidence.  Lucent, 580 F.3d at 1318.

    Willfulness is also a question of fact reviewed for

substantial evidence when tried to a jury.  ACCO Brands, Inc. v.

3

ABA Locks Mfrs. Co., 501 F.3d 1307, 1311 (Fed. Cir. 2007).  To
prove willfulness, the patentee must show at least "objective
recklessness" on the part of the infringer, indicating "that the
infringer acted despite an objectively high likelihood that its
actions constituted infringement of a valid patent."  In re
Seagate Tech., LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en
banc).  "The patentee must also demonstrate that this
objectively-defined risk . . . was either known or so obvious
that it should have been known to the accused infringer."  Id.
"Willful infringement must be proven by clear and convincing
evidence and is determined from the totality of the
circumstances."  ACCO Brands, 501 F.3d at 1311-12.

**III. ANALYSIS**

The Court finds that the evidence presented at trial
created genuine issues of material fact for the jury.  For the
following reasons, IPS's Motion for Judgment as a Matter of Law
of Noninfringement is granted in part and denied in part, and
IPS's Motion for Judgment as a Matter of Law of No Willfulness
is granted in part and denied in part.

**A.   Noninfringement**

IPS asserts that WCM failed to present legally sufficient
evidence of infringement.  (ECF No. 435.)  "A patentee may prove
. . . infringement by either direct or circumstantial evidence.
There is no requirement that direct evidence be introduced, nor

4

is a jury's preference for circumstantial evidence over direct evidence unreasonable per se." Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1219 (Fed. Cir. 2006) (citation omitted). Reasonable inferences of infringement by the jury based on the evidence at trial are sufficient to uphold a determination of infringement. See Nordock, Inc. v. Sys. Inc., 803 F.3d 1344, 1362 (Fed. Cir. 2015).

### 1.    Literal Infringement

On the issue of literal infringement, IPS asserts that WCM failed to present evidence of "lugs" detachably frictionally engaging the inner surface of a "cap" of any Accused Product. (ECF No. 435 at 8-9.)  IPS argues that this evidence is necessary because the asserted claims contain these elements and because each element of an asserted claim must be in an Accused Product for the product to infringe literally.  (Id. at 9.)

The Court finds that WCM presented sufficient evidence for the jury to find literal infringement.  Even if WCM failed to present direct evidence of "lugs" on the locknuts of the Accused Products, WCM presented substantial evidence about "high points," which the jury could reasonably infer to be lugs, or cap retention elements, that detachably frictionally engage with a cap.  Two of WCM's witnesses, Kevin Fink and Scott Sims, testified about high points engaging with a cap of one of the Accused Products.  (Trial Tr. 156:4-19, 168:11-15, 164:4-11,

5

Oct. 14, 2015; Trial Tr., 589:17-590:24, Oct. 16, 2015.)  The
jury could have reasonably inferred from the testimony and its
own examination of the relevant exhibits that the engagement was
frictional.

WCM also cross-examined Jeffrey Humber, an employee of IPS,
about the engagement between high points of a locknut and a cap.
(Trial Tr., 1236:20-1238:11, Oct. 20, 2015.)  While Humber
denied that the high points engaged the cap (id. at
1236:24-1237:2), the jury could have reasonably inferred the
opposite based on Humber's subsequent description of the cap's
engagement with the locknut (id. at 1237:3-1238:11).  Further,
WCM cross-examined James Paschal, an opinion witness for IPS,
about which areas of a locknut constituted high points and how
an overflow plate stayed in position upon installation.  (Trial
Tr., 1608:2-12, Oct. 21, 2015.)  Accordingly, because WCM
presented substantial evidence on which the jury could
reasonably infer literal infringement, IPS is not entitled to
judgment as a matter of law of noninfringement with regard to
literal infringement.

### 2.   Infringement Under the Doctrine of Equivalents

On the issue of infringement under the doctrine of
equivalents, IPS asserts that WCM did not present legally
sufficient evidence under either the "insubstantial differences"
test or the "function-way-result" test to establish

6

infringement. (ECF No. 435 at 12.) "Both the Supreme Court and [the Federal Circuit] have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, . . . 'through [opinion] testimony . . . ; by documents, including texts and treatises; and . . . by the disclosures of the prior art.'" AquaTex Indus., Inc. v. Techniche Solutions, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (quoting Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609 (1950)).

> [T]he difficulties and complexities of the doctrine [of equivalents] require that evidence be presented to the jury . . . through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents.

Id. "The requirement that equivalence be evaluated from the perspective of one of ordinary skill in the art applies whether equivalence is measured by the 'function-way-result' test or by the 'insubstantial differences' test." Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1357 (Fed. Cir. 2004), overruled on other grounds by Williamson v. Citrix Online, LLC, 792 F.3d 1339 (Fed. Cir. 2015).

Since WCM did not present opinion testimony on infringement,[2] none of the evidence introduced at trial is

---

[2] The Court granted IPS's Motion to Exclude the Report and Testimony of Dr. Richard Turley, WCM's opinion witness on infringement, on October 5,

sufficient to prove infringement under the doctrine of
equivalents.  See id. ("The defect in Lighting World's case was
its failure to present evidence regarding the perspective of one
of skill in the art . . . . Thus, we sustain the district
court's entry of JMOL of no infringement under the doctrine of
equivalents . . . .").  Accordingly, IPS is entitled to judgment
as a matter of law of noninfringement with regard to
infringement under the doctrine of equivalents.

### 3.    Indirect Infringement

IPS asserts that because WCM did not prove direct
infringement, its allegations of indirect infringement must
fail.  (ECF No. 435 at 13.)  The Court finds, however, that WCM
provided sufficient evidence of direct infringement through
literal infringement.  See supra Part III.A.1.  Further, the
Court finds that WCM provided sufficient evidence from which a
reasonable jury could infer inducement of third parties, such as
plumbers, to infringe.  WCM presented evidence that IPS's
customers could buy and install trim-kits with their rough-in
kits, thereby infringing the asserted claims.  (See generally
Trial Tr., 684-691, 750-766, 840:25-841:19, Oct. 16, 2015.)
Accordingly, IPS is not entitled to judgment as a matter of law
of noninfringement with regard to indirect infringement.

Thus, IPS's Motion for Judgment as a Matter of Law of

---

2015.  (ECF No. 389 at 29-30.)

Noninfringement (ECF No. 435) is granted as to infringement under the doctrine of equivalents and denied as to literal infringement and indirect infringement.

## B.  No Willfulness

As an initial matter, a finding of willfulness requires that a valid patent is infringed.  State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("To willfully infringe a patent, the patent must exist and one must have knowledge of it.").  The '272 Patent did not issue until November 19, 2013 (Uncontested Fact 5.4, Joint Pretrial Order at 12), approximately ten months after the instant litigation began in January 2013 (see ECF No. 1).  Since post-litigation conduct is not at issue in this case, there can be no willfulness with respect to infringement of the '272 Patent.  The '220 Patent and the '970 Patent are not similarly excluded from the analysis because both were issued prior to January 2013.  (See Uncontested Facts 5.2, 5.3, Joint Pretrial Order at 12.)

IPS asserts that WCM, limited by the Court to present evidence of willfulness only in IPS's pre-litigation conduct, failed to demonstrate IPS's notice or knowledge of the asserted patent claims.  (ECF No. 436 at 1-2.)  While the Court instructed the jury that AB&A's activities prior to IPS's asset acquisition were not evidence of anything IPS did or had knowledge of prior to the acquisition (Trial Tr. 1914:21-1915:3,

Oct. 22, 2015; see also Jury Instructions at 5, ECF No. 446),

IPS may nevertheless be liable for its own objective

recklessness in failing to assess its post-acquisition exposure

to infringement allegations.

During trial, the president of IPS's plumbing division,

Nick Casella, provided testimony which indicated that IPS did

not perform due diligence when it acquired the assets of

American Brass & Aluminum Foundry Company ("AB&A") as to whether

AB&A's products infringed any intellectual property.  Casella

testified that IPS did not conduct an investigation during the

due diligence period into how the Classic product line had been

developed by AB&A.  (Trial Tr. 902:25-903:8, Oct. 19, 2015.)

When asked if he relied on the Oropallo brothers, the owners of

AB&A, for the information, Casella testified, "We didn't ask

specifically because it had been on the market for eight years.

We didn't ask specifically how the Classic got into the product

line, no."  (Id. at 903:9-13.)  Casella also testified that a

patent infringement lawsuit between WCM and IPS was pending at

the time of the closing of the AB&A asset purchase, but that he

had not done "an analysis on the claims of the patent" at issue

in that case.  (Id. at 1133:16-18; see generally id. at

903:23-904:6; 905:5-15.)  He testified that prior to the

closing, he "had not been provided any notice of the WCM patents

related to the bath waste and overflow" and that prior to the

filing of the instant lawsuit, he had not been "provided with any notice of WCM's bath waste and overflow patents . . . asserted in this case." (Id. at 1143:17-25.)

Former AB&A president, Anthony Oropallo, via video deposition, also acknowledged that AB&A had not employed engineers, draftsmen, or full-time product developers. (Trial Tr., 539:17-23, Oct. 16, 2015.) This was corroborated by Casella (Trial Tr. 900:5-17, Oct. 19, 2015) and Michael Jaffa, an independent representative for AB&A and IPS (Trial Tr., 616:25-617:12, Oct. 16, 2015). Todd Ricco, a national sales manager for IPS, who had previously been employed by AB&A in the same position, testified via video deposition that he had never seen an engineering drawing or a technical drawing of the "Classic" product during his employment with AB&A. (See Trial Tr., 504:8-9, Oct. 15, 2015 (Ricco Dep. Tr. 47:10-20).)

The Court finds that there was sufficient evidence presented for the jury to reasonably conclude by the clear and convincing standard that IPS knew or should have known that there was an objectively high risk of infringement after acquiring AB&A's assets. Viewing the evidence in the light most favorable to WCM, and giving WCM the benefit of all reasonable inferences, IPS's conclusion that there was no willful infringement of all three patents is not the only reasonable conclusion. Although there can be no willful infringement of

11

the '272 Patent, because it was not issued pre-litigation, the other two patents in this case were issued pre-litigation, and the evidence presented does not lead only to a conclusion of no willfulness.  Thus, IPS's Motion for Judgment as a Matter of Law of No Willfulness (ECF No. 436) is granted as to the '272 Patent and denied as to the '220 Patent and the '970 Patent.

## IV.  CONCLUSION

For the foregoing reasons, IPS's Motion for Judgment as a Matter of Law of Noninfringement is GRANTED as to infringement under the doctrine of equivalents and DENIED as to literal infringement and indirect infringement.  IPS's Motion for Judgment as a Matter of Law of No Willfulness is GRANTED as to the '272 Patent and DENIED as to the '220 Patent and the '970 Patent.

**IT IS SO ORDERED**, this 4th day of December, 2015.


/s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

12